**FREEDOM FROM RELIGION FOUNDATION, INC., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker, Plaintiffs,**

v.

**Scott McCALLUM, Jennifer Reinert, Richard Gartner, George Lightbourn And Jon E. Litscher, Defendants,**

and

**Faith Works, Milwaukee, Inc., Defendant–Intervenor.**

No. 00–C–617–C.

United States District Court, W.D. Wisconsin.

Jan. 7, 2002.

Richard L. Bolton, Boardman, Suhr, Curry & Field, Madison, WI, for Plaintiffs.

Daniel Kelly, Reinhart, Boerner, Van Deuren, Milwaukee, WI, for Gartner, Lightbourn, Litscher, McCallum, Reinert and Thompson.

Theodore C. Hirt, U.S. Dept. of Justice, Federal Programs Branch, Washington, DC, for U.S.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1983. Plaintiffs Freedom From Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker contend that defendants violated the establishment clause of the First Amendment to the Constitution by funding defendant-intervenor Faith Works, Milwaukee, Inc., a faith-based, long-term alcohol and other drug addiction treatment program. Specifically, plaintiffs contend that two of Faith Works' funding streams violate the establishment clause: a grant from the Department of Workforce Development and a contract with the Department of Corrections. Subject matter jurisdiction is present under 28 U.S.C. § 1331.

Presently before the court are plaintiffs' and defendant-intervenor Faith Works'

cross-motions for summary judgment. As a preliminary matter, I note that defendants have not filed a motion for summary judgment, but have filed briefs and proposed findings of fact in response to plaintiffs' and defendant-intervenor's motions. I construe defendants' briefs and proposed findings of fact to include a motion for leave to file them, which I will grant. Although this court's *Procedure to be Followed on Motions for Summary Judgment* presupposes that the party filing briefs and proposed findings of fact has also filed a motion for summary judgment, nothing in the court's procedures prohibits a defendant from supplementing a co-defendant's motion. Therefore, I have considered defendants' submissions.

Because I find that the Department of Workforce Development's grant to Faith Works constitutes unrestricted, direct funding of an organization that engages in religious indoctrination, I conclude that this funding stream violates the establishment clause. Accordingly, I will grant plaintiffs' motion for summary judgment and deny defendant-intervenor Faith Works' motion for summary judgment as to the Department of Workforce Development funding. Because the undisputed facts do not establish whether offenders under the supervision of the Department of Corrections who participate in the Faith Works program do so of their own independent, private choice, I am unable to determine whether the Department of Corrections funding represents direct or indirect funding of an organization that engages in religious indoctrination. Therefore, it is not possible to determine whether this funding stream violates the establishment clause. It will be necessary to hold a trial on plaintiffs' establishment clause claim with respect to the Department of Corrections funding of Faith Works in order to establish whether the funding is direct or indirect.

In addition, I conclude that Faith Works' rights under the free speech and free exercise clauses of the First Amendment would not be violated if this court were to bar state funding of its program because of its sectarian viewpoint. Finally, I find that this case does not involve a challenge to the constitutionality of the charitable choice statute, 42 U.S.C. § 604a, which requires that public funds be distributed to faith-based organizations in accordance with the establishment clause. Therefore, it will not be necessary to address the constitutionality of this statute.

For the purpose of summary judgment, I find from the facts proposed by the parties that the following are material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiffs Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker are Wisconsin residents and state and federal taxpayers opposed to the use of state appropriations to advance and promote religion. Plaintiff Freedom From Religion Foundation, Inc. is a representative organization advocating establishment clause issues on behalf of its members who are opposed to the use of state appropriations to promote religion.

Defendant Scott McCallum is Governor of the State of Wisconsin. Defendant Jennifer Reinert is Secretary of the Wisconsin Department of Workforce Development. Defendant Richard Gartner is Administrator of the Division of Workforce Excellence in the Department of Workforce Development. Defendant George Lightbourn is Secretary of the Department of Administration. Defendant Jon E. Litscher is Secretary of the Department of Corrections. Defendant-intervenor Faith Works, Milwaukee, Inc. provides a faith-based ap-

proach to drug and alcohol addiction through long-term residential treatment. Faith Works receives funds derived from taxes paid by the taxpayers of the state of Wisconsin.

## B. *The Faith Works Program*

### 1. *General program aspects*

Faith Works provides long-term residential treatment to male drug and alcohol addicts. It is an independent "faith-based program designed to meet the needs of individuals recovering from addiction to alcohol and other drugs" and to assist them in becoming employed and fully functioning members of society. It has been operating for approximately two years, since it opened its treatment program in Milwaukee, Wisconsin on December 6, 1999.

The Faith Works program is "committed from day one of [the] clients' enrollment to empower them to live in their community with the best possible chance for societal and economic success." Faith Works strives to incorporate all available community services into the participants' recovery process, on the theory that the participants need to learn how to gain access to those services after completion of the program "for continued support for themselves and the family for whom they have now taken responsibility." A goal of the program is to have each participant have either a spiritual mentor or an Alcoholics Anonymous sponsor (a spiritual person with the AA 12–step program perspective). The Faith Works Milwaukee Annual Report 2000 states that the program has four important aspects: recovery; employment; family services; and spiritual enrichment.

### 2. *Faith Works staff*

Faith Works counselors work 40 hours a week. The counselors estimate that they spend approximately eight hours a week, or 20 percent of their time, addressing questions of faith or spirituality. They are open to spiritual discussions at any time. The rest of their time is spent on the day-to-day efforts necessary to help recovering alcoholics and drug abusers reorder their lives so that they do not fall back into their addictions.

Commitment to Christian beliefs and values is a hiring consideration for counseling staff, but Faith Works does not impose religious restrictions on staff appointments. Church attendance is expected for Faith Works staff. Faith Works staff counsel participants to develop a personal relationship with God. Counselors discuss issues of faith in order to promote the state objectives of providing alcohol and other drug addiction treatment to non-custodial parents and obtaining unsubsidized employment.

Faith Works counselors help participants (1) develop a personal service plan addressing each of the individual's needs; (2) get involved in a supervised work internship; (3) assess progress in achieving goals; (4) identify and discuss which aspects of the participant's life need attention; (5) develop a money management plan; (6) write résumés; (7) reconcile with their families; (8) connect with high school equivalency training, computer learning labs and other related services; (9) learn how to function in society at large without drugs or alcohol; (10) find housing; (11) solidify independent living skills; and (12) develop a community-based support network. Counselors also help participants find unsubsidized employment and serve as job coaches once participants are employed.

In addition to counselors, Faith Works employs security personnel, non-counseling administrative staff and food service personnel to support its overall program-

ming and to provide housing and meals to its residents. The Department of Workforce Development grant agreement and the Department of Corrections contract require Faith Works not to discriminate by hiring on the basis of religion.

The Faith Works Standards of Practice list the following guidelines for all staff:

> We are a Christian faith-based treatment center. This means all staff is to serve as Jesus served; with compassion, concern and love for all persons, regardless of race, creed, background or whatever sins a person is struggling to overcome through this program.
>
> . . . . .
>
> We are serving the Lord in evangelistic outreach and will respect the Holy Spirit's ability to work in each person's life whether staff or resident. We need to be mature in our faith and work habits in order to be truly able to be witnesses to the Lord and His Grace.

### 3. The Faith Works phases

Participation in the Faith Works program can last up to a year. It has four phases, each of which lasts as long as each individual participant requires. During all of the phases, participants are required to attend AA and group meetings unless they are engaged in educational or job-related activities off-campus.

During phase one, each participant meets with a counselor once a week for a one-on-one session to discuss the individual's needs and goals. In phase one, the daily schedule includes the following agenda: wakeup; breakfast; chapel; phase one meeting (AA); house detail; prayer; relapse prevention; house detail; step meeting (AA); dinner; AA/NA meeting; free time; curfew; and lights out. The second phase builds on the first, but concentrates more on employment and educational needs. Phase three starts the transition to the private sector; it begins when a resident has secured outside employment. The fourth and final phase seeks to reintegrate the participant with his community. Counselors help participants find housing, solidify their independent living skills and develop a community-based support network. When Faith Works and the participant have accomplished these objectives, the participant graduates from the program.

### 4. The Faith Works "faith" component

As the name implies, Faith Works is a faith-based organization. As a practical matter, this means that, although the majority of time staff spends at Faith Works involves the everyday aspects of helping the participants recover from addiction, become gainfully employed and re-establish ties with their families and reintegrate with their communities, staff members also offer those who acknowledge some spiritual significance to their lives an opportunity to develop that aspect in their recovery. In its grant proposals, Faith Works promotes spirituality as a basis of the program's success, along with the extended length of the program.

According to Faith Works, recovery is accomplished when participants address their spirituality. Faith Works seeks to help its participants grow and define their spirituality. It describes its residential recovery program facility as a spiritual center because part of the program offerings are spiritually based. It requires its residents to participate in a faith-enhanced 12–step AA program that is mandatory for participants. Faith Works' version of AA involves more explicit references to God than the standard AA. Faith Works makes Bible studies, prayer time and chapel services available on a voluntary basis.

Staff meetings at Faith Works begin with a prayer. The Faith Works Standards of Practice for all staff includes the requirement that staff members "[grow] in [their] own faith life by regular church attendance, prayer, Bible study and seeking Spiritual direction from a Pastor/Shepard in our faith community." The Faith Works counseling staff has an extensive knowledge of scripture.

According to Robert Polito, the former executive director of Faith Works, Milwaukee, the majority of Faith Works clients are not in a practicing faith when they enter the program but most graduates have some sort of relationship with God when they leave. Participants are not required to profess any religious faith; at the same time, discussion about spiritual matters occurs during mandatory meetings. Active participation in the faith component of these meetings is not required but attendance is mandatory. Discussion of faith in these meetings is encouraged.

Polito believes that organized religion is a potential aid to program participants because "dependence on a higher or supreme being is helpful when dealing with problems that are viewed as bigger than yourself." For Polito, faith is the essence of sobriety. Faith Works relies heavily on the Christian experience of staff members who have combatted addiction successfully. According to Polito, goals of the program include participants' openness to "discipleship" and membership in an organized church, attendance at Bible studies, finding a spiritual advisor and participation in Christian counseling services.

Participants may take advantage of the counselors' availability to discuss matters of spirituality. Faith Works' counselors are equipped to study the Bible, pray with participants and provide guidance on becoming part of a local faith community. Counselors make themselves available to "facilitate a transformation of the heart and soul as a part of the healing process." In all things, though, staff members are admonished to "lead by example not by dictates." Thus, they allow their "faith and work habits ... to be witnesses to the Lord and His Grace." Whenever the counselors discuss matters of faith or spirituality, it is in the context of helping the participants to achieve the goals of sobriety, employment and responsible fatherhood. The Faith Works Statement of Faith makes clear that "[t]he essence of this ministry is to develop a community of believers that would foster rigorous honesty; first with God, second with oneself and third with the Body of Christ." Counselors welcome discussions regarding the participants' spiritual issues but never require them. When a participant chooses not to address matters of faith, Faith Works staff still helps that person with recovery; he does not receive any less attention, services or welcome from staff. When issues of spirituality are raised, counselors do not attempt to convert participants from one faith to another or from faithlessness to faith. Counselors' interactions with the participants on this topic consist of describing the effect of their own spiritual experiences on their lives and assisting participants in addressing matters of faith to the extent desired by the participants. At the same time, participants are encouraged to integrate spirituality into their recovery program.

Although the people who staff Faith Works are predominantly Christian and the statement of faith emphasizes the Christian experience, Faith Works staff serve those of all religious backgrounds. In addition to Christians, Faith Works has served Jews, Muslims, Native Americans and atheists. No one is required to switch allegiance to any other religion or faith. The program accepts each participant

without religious preconditions, tests or requirements. The program does not administer religious sacraments.

Faith Works' bylaws state that its program addresses the needs of "[a]ddiction recovery, relying on a faith enhanced model of the 12–step program." The bylaws state that the "program seeks to put a holistic, faith-based approach to bring healing to mind, body, heart and soul. While the program is inherently Christian, services will be offered to all persons who seek it, regardless of their faith background."

Faith Works identified the religious component of its program in grant proposals submitted to the Wisconsin Department of Workforce Development. In one, the author states that Faith Works "is a faith based, long-term residential, holistic program that emphasizes spiritual, physical, emotional and economic wellness." He adds that Faith Works offers a "12–step recovery process in a faith based setting provided by counselors and 12–step volunteer leaders." According to the proposal, one of the goals of Faith Works is to "facilitate stability in employment and recovery, successfully transition to independent living after nine months residency, with assistance in locating housing, as well as support services, church affiliation, 12–step meetings and other support programs that would replace in the new neighborhood what was supplied in the [Faith Works] resident program."

In one description of its program, Faith Works states, "As a member of the faith community we rely heavily on churches, synagogues and mosques for assistance in all aspects of our program design. We believe that our client will benefit greatly from the relationships built and services offered. Key elements include: (1) stressing the importance of church affiliation and membership; and (2) teaching reliance on the faith community for various social services needs."

Reverend Susan Vergeront was president of the Faith Works board of directors until January of 2000. According to Vergeront, faith and spirituality are integral components of the Faith Works program and contribute to the success of the program. Vergeront explains that the spiritual component of Faith Works involves addressing "where [clients] are in their faith relationship with God, and [giving] them opportunities to develop and deepen that faith." Vergeront believes that the Christian-based faith component is essential to Faith Works' holistic approach, which involves the physical, spiritual and emotional elements of an individual's life.

Faith Works utilizes connections to the Milwaukee religious community and makes available information about the surrounding Milwaukee faith community to participants. Vergeront believes that the emphasis on the Christian faith is appropriate in the Milwaukee area, which, she estimates, has a population that is approximately 80% Christian.

Linda Zick, director of counseling and assistant director of Faith Works, considers the faith component of Faith Works to be a significant factor in achieving and sustaining recovery for participants. Although Zick does not believe the Faith Works program promotes one particular faith, she does understand the program to be evangelistic in terms of bringing participants to a faith experience.

Zick states that program expectations about religion are made known to participants during an intake evaluation, at which time participants are asked about their belief system. Zick tells potential participants that Faith Works is a faith-based program, "which means that we ask them to seek out something to believe in. If

they have a belief system, we encourage them to enhance that, get whatever that is going more in [their] life. And if [they] don't [have a belief system], we're hoping that through the time that [they're] here [they] will search that out."

Although participants may attend non-Christian off-premises services, they still must attend Faith Works meetings. In general, the level of spirituality of participants entering the program is not high, but approximately half of the program graduates progress spiritually. According to Zick, about half of the program graduates have a spiritual mentor.

### 5. Faith Works' statement of faith

Faith Works' employee handbook opens with a five-page document entitled "Statement of Faith," which is a statement of Christian principles that guide the organization. The statement of faith is included in the employee handbook distributed to all employees to explain the general philosophy of the program and the responsibilities of its employees.

Polito prepared the statement in New York in 1995 for another organization, the Bowery Mission, to explain to the Mission's board of directors the basic purpose and operation of the new "Avenue D" program the Mission was undertaking. The Mission model existed to win converts to Christianity and conditioned the receipt of secular benefits on attending religious services and professing faith. The Avenue D program followed a different model for delivery of social services; it focused on the secular goals of drug therapy, education, jobs and housing. Faith Works was intended to replicate the New York City Avenue D program and not the Mission model. Faith Works, Milwaukee is the only Faith Works program that has been established outside New York City.

The Faith Works statement of faith provides in part:

The essence of this ministry is to develop a community of believers that would foster rigorous honesty; first with God, second with oneself and third with the Body of Christ. We believe that if a person can approach his relationship with the Lord with brutal honesty, he can begin to be honest with himself. When a person is honest with God and oneself he can develop relationships with other believers, which is a tremendous source of God's grace and healing. It is our experience that the two most common hindrances to an effective ministry are denial and fear. "Perfect love casts out all fear." 1 John 4:18.

. . . . .

The addict learns that he had a deep "soul sickness," and it is only by connecting to God through profession, confession, prayer and involvement in a worshipping community that he has any hope of sustaining a life in recovery. AA teaches this but stops short of recommending Christ to all. However, at Faith Works we do.

(The statement of faith is reprinted in full in Addendum A.) According to the statement of faith, Faith Works counselors should suggest to participants that they find a relationship with God through the person of Jesus Christ.

### C. Funding Streams for Faith Works

The success of the Faith Works model program is determined by four criteria, one of which is the "success of blending government money with a faith based institution, measured by ongoing funding streams and fundraising abilities." Government contracts are integral to Faith Works' operation; Faith Works could not have begun operations without prior public commitments of money. Approximately

two-thirds of Faith Works' revenues come from public funding. Faith Works receives its funds through four sources: (1) private institutions; (2) Wisconsin Works agencies; (3) Department of Corrections contracts; and (4) Department of Workforce Development grants from the Wisconsin governor's discretionary portion of a federal Temporary Assistance to Needy Families block grant. (Although the facts relating to the Department of Corrections contract and the Department of Workforce Development grant are specific to 1999 and 2000, defendants have not notified the court that the funding streams have changed for 2001 or 2002). Plaintiffs do not contend that the first two funding sources violate the establishment clause. Instead, they are challenging only the latter two funding sources in this lawsuit.

### 1. *Private foundation grants*

Faith Works has received grants from private foundations in varying amounts. In 1998, it received $100,000 for general operations; in 1999, it received $100,000 to offset startup costs. In 2000, it received a grant of $25,000 for general operations and a grant of $50,000 for start up expenses, half of which was paid in 2000 and the other half in 2001. In 2001, it received $20,000 of Community Building Initiative funds, an award of $10,000 for general operating expenses and $150,000, to be paid out over two years. The last amount is available for general operating expenses.

### 2. *Wisconsin Works contracts*

Wisconsin Works, or "W–2," is a comprehensive, state-wide program that helps participants obtain employment. It is funded through the 85% formula grant of federal Welfare–to–Work funds. Wisconsin Works agencies are county-based agencies that receive funds under contract with the Division of Economic Support in the Department of Workforce Development to provide cash assistance to applicants who are eligible for welfare and supportive services to move people from welfare to work.

When a non-custodial father decides he needs alcohol and other drug addiction treatment and employment services, he approaches a Wisconsin Works agency. If the father qualifies for assistance, the agency allows him to choose a service provider. If the father selects Faith Works, he meets with a staff member to discuss the elements of the program, including the faith-based components. The prospective enrollee is informed that enrollment in the program is voluntary. Participants may leave the program at any time with no adverse consequences and may seek treatment from another service provider.

Faith Works has service contracts with each of the four regional Wisconsin Works agencies for the provision of social services. These contracts establish indirect funding to Faith Works as a means for Wisconsin residents to obtain social services.

### 3. *Department of Corrections contracts*

Faith Works has a contract with the Wisconsin Department of Corrections to operate a halfway house providing twenty-four hour supervised residential care and related services. The department reimburses Faith Works for the services it provides on a monthly basis; it funds Faith Works only when supervised offenders enroll in the program. A service provider such as Faith Works must have a state-approved contract as a condition to being paid for providing alcohol and other drug addiction services.

In fiscal year 1998, approximately $1 million of the governor's 15% discretionary Welfare–to–Work grant funds were allocated to the Department of Corrections for its Non-custodial Parent Project. In Sep-

tember 1998, the Department of Corrections Secretary, the Assistant Regional Chief of Region III (Milwaukee County), Kathleen Ware, and others met with Susan Vergeront and State Senator Robert Welch to decide whether the department would contract with Faith Works to provide alcohol and other drug addiction treatment to persons within the control of the department. After deciding to do so, the Department of Corrections drafted a proposed contract that required the approval of former Governor Thompson because the contract amount exceeded the department's unilateral contracting authority. Kathleen Ware prepared the request for purchasing authority.

Most Department of Corrections purchases are obtained by competitive bid. The governor's bid waiver is a procedure that eliminates the need to obtain competitive bids before entering into a contract for the purchase of goods or services. A waiver may be requested for a number of reasons, including the uniqueness of a proposed service or time constraints on the availability of funds. The department did not follow the competitive bid process during the Faith Works procurement. It considered the Faith Works services unique because no other provider in Milwaukee provided a long-term residential program like Faith Works. Residential halfway houses involve only three months of treatment. As far as Ware knew, the Faith Works program was not being replicated in the Milwaukee area.

On August 23, 1999, Ware wrote to the department's purchasing agent to request a governor's bid waiver to purchase long-term residential male alcohol and other drug addiction treatment from Faith Works. She stated that "[g]iven the uniqueness of this program[,] there does not appear to be any other resource in Milwaukee County that offers long term,

faith based AODA [alcohol and other drug addiction] programming that also emphasizes employment and responsible fatherhood." The memorandum described the Faith Works program as a

> long term (9 months) residential treatment program for males that is faith based.... The program is based on Christian principles; however, will accept any male of any faith who wants to strengthen their faith. The program is 9 months in length with an emphasis on employment, responsible parenting and overcoming addiction problems. The program is based on a phase system wherein residents first address their addiction problems and then must find employment and begin paying child support. Offenders admitted would have to voluntarily agree to participation and to working on their faith. Faithworks is a well known program in New York City that is praised for their success in working with homeless, drug or alcohol addicted men.

In a separate document, the Department of Corrections described the Faith Works program as a "faith-based program offering some alcohol and drug abuse services based on the principles of Alcoholics Anonymous and Christianity."

In November 1999, after former Governor Thompson signed the necessary documents, the Department of Corrections entered into a contract with Faith Works in an amount not to exceed $49,961 for five beds over a period of nine months. The contract provides that Faith Works will deliver the following services: twenty-four hour residential care, services and supervision; individual and group counseling; sufficient qualified staff; intake assessments; individual treatment and supervision plans for each resident; programming; monitoring; transportation; drug screening; entrance physical examinations; medical ser-

vices; and aftercare plans. The contract also provides that the provider "agrees to comply with State and Federal constitutions, laws or rules and regulations . . . ."

The department renewed its contract with Faith Works in 2000, again bypassing competitive procurement procedures because of the allegedly unique nature of the Faith Works services. The renewal contract was funded with state general purpose revenue and funding from the Temporary Assistance to Needy Families program. The department anticipated renewing the Faith Works contract in 2001, again following the request for purchasing authority and bid waiver procedures.

Region III of the Department of Corrections, which includes Milwaukee County, contracts with several providers of residential and outpatient alcohol and other drug addiction services for persons within its control. The department has outpatient counseling contracts with three organizations, offering male and female day treatment centers as well as alcohol and other drug addiction groups at field offices. The department has a female halfway house contract with one provider. In addition, the department has contracted with two providers to provide three male alcohol and other drug addiction halfway house programs. All of the residential halfway house programs are three months in duration.

In placing offenders under supervision into programs, an agent assesses the level of service needed by an offender, then directs him or her to participate in Faith Works or other appropriate services as a condition of his or her supervision. These services may include alcohol and other drug addiction treatment, living skills, transitional and emergency housing, anger management and domestic violence. In order to be directed to Faith Works, an offender must meet the eligibility require-ments for non-custodial parents under the Welfare–to–Work grant, have a significant alcohol and other drug addiction problem needing treatment, need residential care or services and have an addiction so disabling that he cannot be placed in the community without supervision.

In general, the probation or parole officer, and not the offender, contacts Faith Works after determining that the offender should receive services from Faith Works. Offenders are interviewed by a Faith Works staff member before attending the program to assess their level of commitment; potential participants need to have a willingness to develop their faith and the spiritual aspects of their lives. Offenders do not have to accept treatment at Faith Works and may go to an alternative treatment facility, but no other program in the Milwaukee area provides long-term residential treatment.

Ware understood that faith was an integral part of the Faith Works program. When the contract with Faith Works was negotiated, she knew that the program incorporated prayer and Bible study and required participants to be willing to work on their faith and their spiritual needs. The department has no rules or regulations relating to the purchase of faith-based services. Contracts with the state do not prohibit integration of religion into the substantive services purchased by the state. The department contracts with faith-based service providers with the understanding that offenders under the control of the department may not be compelled to participate in faith-based programs. The Department of Corrections has never objected to the content of the Faith Works program.

4. *Department of Workforce Development grants to Faith Works*

In May of 1999, Vergeront sought funding from the governor's 15% discretionary

funds as a Welfare–to–Work special project. Welfare–to–Work is a federal program with funds earmarked to "create job opportunities for the hardest to employ Temporary Assistance to Needy Families recipients." The program's target population includes non-custodial parents with two or more barriers to employment who receive only limited services under the Wisconsin Works program. The Welfare–to–Work grant funds may be used for "allowable costs" as determined by the "applicable rules, regulations, state policies" and the grant documents. Allowable costs include personnel salaries and wages, administration and computer expenses, facility lease payments and program expenses not met by contract income with the Wisconsin Works agencies. Welfare–to–Work grant recipients may use the funds for job readiness activities, job placement services, employment activities, post-employment services and job retention and support services.

In looking for funding, Vergeront contacted Toya Nelson, the Chief of the Local Employment Programs and Job Center Section of the Division of Workforce Excellence because Nelson's section reviews and makes recommendations to the governor regarding proposals for funding from the governor's discretionary pool of money. The governor's discretionary funds are allocated to innovative and unique programs. Eligibility to apply for Welfare–to–Work grant funds is not based on the religious or non-religious character of an entity and no entity is ineligible to apply for the funds.

In the summer of 1999, Faith Works submitted a proposal to the Division of Workforce Excellence, proposing an "addiction recovery program for men" that is "a faith based, long-term residential, holistic program that emphasizes spiritual, physical, emotional and economic well-ness." The proposal states that Faith Works "provide[s] a 9 month, residential, addiction recovery program for men that addresses not only the addiction, but all areas of life that addiction has damaged: economic, social, family, and spiritual."

The proposal identifies the following specific services to be offered by Faith Works, among others: 12–step recovery process in a faith-based setting provided by counselors and 12–step volunteer leaders; individual and group counseling by Faith Works counselors; job readiness skills; living skills; housing assistance; and aftercare counselor and staff. The Faith Works proposal provides that Faith Works "plan[s] to recruit the neighborhood churches to help lead Bible Studies and worship services for the men. These would be optional attendance for participants. [Faith Works] will link up with 12–step programs through AA to lead nightly meetings. This would be mandatory."

Nelson recommended funding from the governor's discretionary funds. In fiscal year 1998, Faith Works was awarded $150,000 from the governor's discretionary funds. These funds were not disbursed on the basis of the number of individuals referred to Faith Works but rather as a block amount. In fiscal year 1999, Faith Works received a second grant in the amount of $450,000. This larger amount was contemplated at the time the original appropriation was made to Faith Works. Faith Works has received the entirety of these funds.

Nelson understood Faith Works to be a holistic program, in the sense that it provided comprehensive services relating to a person's whole life, such as life skills, self-discipline, recovery counseling and moving from sheltered employment to outside employment. Nelson was unaware that Faith Works included any faith component. Nelson evaluated the Faith Works

program in terms of the allowable services it would provide; under the department's contract, faith was not labeled as a deliverable service. Nelson understood that Faith Works was generally Christian-based but did not know about the specific faith component of the Faith Works delivery model for services and made no inquiry into it. In her meetings with Vergeront, Nelson did not have any discussions about faith or religion as they related to the Faith Works program. Vergeront provided Nelson with literature about Faith Works describing the program as inherently Christian, including use of a faith-enhanced 12–step AA protocol. Nelson paid no attention to the faith component in these descriptions of the program. No one from the state government, including the governor's office or the Department of Workforce Development, has informed Faith Works that the grant funding should not be allocated to religious activities.

Counseling services are an integral component of the services Faith Works agreed to provide under the grant agreement. The Department of Workforce Development funding for Faith Works was intended to promote employment and the "employment and training services offered are fully integrated with alcohol and other drug counseling, as well as job and life skills training." The grant agreement states that "[g]rant funds may not be used to attempt to support either religious or anti-religious activities." The grant agreement also provides that the "Grantor, the State or the Federal Government may conduct any monitoring or other reviews as they may deem necessary." Faith Works sends invoices to the Department of Workforce Development on a periodic basis as it incurs expenses eligible for reimbursement, including part of its employees' salaries. These invoices are not based on a per capita enrollment but are part of a block grant.

In summary, defendant-intervenor Faith Works receives funding from four sources: private foundations; Wisconsin Works agencies; the Department of Corrections; and the Department of Workforce Development. Plaintiffs are not challenging the funding that Faith Works receives from private sources or Wisconsin Works agencies, but are challenging the funding from the Department of Corrections and the Department of Workforce Development. Under the Department of Corrections contract, Faith Works is a pre-selected provider for offenders under the supervision of the department. When offenders are directed to Faith Works and enroll there, the Department of Corrections reimburses Faith Works on the basis of the number of offenders participating in the program. The Department of Workforce Development grant does not depend on the number of eligible Wisconsin Works recipients enrolled in the program but instead is issued to Faith Works in a pre-determined amount.

### D. *Use of Funds*

Faith Works uses the funds it receives to pay for personnel, food, utilities, furniture and equipment, client supplies and laundry, office equipment, client transportation, insurance, professional fees, maintenance supplies and the lease on the physical facility. Of its total operating expenses, Faith Works spends $114,300 on salaries for its three counselors and the administrator who oversees their responsibilities.

Faith Works amended its 2001 budget to demonstrate that it receives sufficient non-restricted funds to pay for the entirety of its counselors' salaries. Both the original and the amended budgets show the same categories of expense and the same estimated expenses for each category. The

amended budget reflects Faith Works' receipt of $300,000 through the Welfare–to–Work grant rather than $375,000 as indicated in the original budget. This difference is made up through an increase in private funding. In 2001, Faith Works expected to receive approximately $215,000 in private funding instead of the originally projected $140,000. The current budget allocates $160,000 to the payment of employee salaries. The 2001 budget anticipates approximately $165,000 from contracts with Wisconsin Works agencies and the Department of Corrections.

State money and private foundation money are deposited into the same bank account from which counselors' salaries are paid. At any given time, it is not possible to trace the source of bank deposits, to determine that money from private grants has been earmarked to pay counselors' salaries or to determine that state funds are not being used to pay counseling staff.

## OPINION

### A. *Standing*

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A litigant must show the existence of an actual case or controversy within the meaning of Art. III of the Constitution, which means that he or she must allege "an actual injury redressable by the court," *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citation omitted), in which he or she has a personal stake. *Gonzales v. North Township*, 4 F.3d 1412, 1415 (7th Cir.1993). This is intended to insure sharply focused adversarial positions and to avoid the issuance of advisory opinions.

■■■ At the summary judgment stage, a plaintiff must produce evidence to support the injury allegation in the form of affidavits or documents. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In this case, plaintiffs have submitted affidavits establishing that they are state and federal taxpayers who are opposed to use of government funds to advance or promote religion and a representative organization whose members oppose the endorsement of religion. *See* Affidavits of Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker, dkts. ##41, 42, 43. As in *Freedom from Religion Foundation, Inc. v. Bugher*, 249 F.3d 606 (7th Cir.2001), plaintiffs have met the standing requirement "by showing that as taxpayers their tax dollars have gone to support an allegedly unconstitutional program which contributes unrestricted cash grants to religious [programming]." *Id.* at 610 (citing *Freedom from Religion Foundation, Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir.1988)).

■■■ Faith Works contends that the exclusion of faith-based providers from state funding would burden the rights of program beneficiaries under the free exercise clause of the First Amendment. This contention raises the question whether Faith Works has standing to assert the claim of its participants. In general, a party cannot raise the claims of third parties who are not part of the lawsuit. *Warth*, 422 U.S. at 499, 95 S.Ct. 2197. However, under circumstances in which there exists a close relationship between the advocate and the third party, a party that has suffered an injury has standing to raise a claim for third parties not before the court. Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.4 (3d ed.1999). *See,*

e.g., *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (because doctors are denied payments for medical services, they have standing to assert claim of patients in challenging law restricting Medicaid repayments for abortions); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (because vendors suffer economic loss, they have standing to assert rights of customers in challenging alcohol law). Faith Works asserts that it has a legally protected interest in free speech and that it would suffer injury if it were excluded from public funding because of its religious viewpoint. For the purpose of determining standing, I will assume that Faith Works has a close relationship with its participants and, therefore, that it has standing to raise the free exercise claim of its participants.

### B. *First Amendment: Establishment Clause*

The establishment clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." It prevents the government from promoting any religious doctrine or organization or affiliating itself with one. *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 589, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). It "is a specific prohibition on forms of state intervention in religious affairs." *Lee v. Weisman*, 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and its proscription applies equally to state legislatures under the due process clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

In an attempt to help the lower courts identify improper sponsorship, financial support or active involvement of the government in religious activity, the United States Supreme Court has devel-oped a three-pronged test to determine whether a statute or program complies with the establishment clause. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under this test, a statute does not violate the establishment clause if (1) it has a secular legislative purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create excessive entanglement between government and religion. *Id.* at 612–13, 91 S.Ct. 2105. In *Agostini v. Felton*, 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Supreme Court modified the *Lemon* test, emphasizing the continuing importance of the first two prongs, but determining that entanglement could be considered an aspect of the second prong's "effect" inquiry. In *Agostini*, the Court used three primary criteria in evaluating whether government aid has the primary effect of advancing religion: whether the statute or program in question "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." *Id.* at 234, 117 S.Ct. 1997. Under the resulting *Lemon Agostini* test, a publicly funded program does not violate the establishment clause if (1) it has a secular purpose; (2) it does not result in governmental indoctrination; (3) it does not define its participants by reference to religion; and (4) it does not create excessive entanglement.

Plaintiffs concede that Faith Works is not unconstitutional under the first prong because it has a secular purpose: providing drug treatment and employment training. Plaintiffs do not assert that Faith Works defines its recipients by reference to religion. Therefore, I will focus on the two remaining criteria, (2) and (4), addressing them in reverse order. Before doing so, I note that plaintiffs assert that the state's funding of Faith Works consti-

tutes the governmental endorsement of religion. Such a challenge is inapposite in this case. Although endorsement remains applicable to a narrow window of cases involving matters such as prayer, the display of religious symbols and imagery on public property, *see, e.g., Books v. City of Elkhart,* 235 F.3d 292, 301-2 (7th Cir. 2000), matters such as these are not present in this case. This makes it unnecessary to address plaintiffs' endorsement argument, although if I were to do so, I would analyze it using the same factors used in analyzing the primary effect prong of the *Lemon* test, as prescribed by a majority of the Court in *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000).

### 1. *Excessive entanglement*

 In assessing excessive entanglement, the Court looks to the "character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105. Excessive entanglement exists where "(i) the program would require 'pervasive monitoring by public authorities' to ensure [that the publicly funded employees] did not inculcate religion; (ii) the program required 'administrative cooperation' between the [government and sectarian organizations]; and (iii) the program might increase the dangers of 'political divisiveness.'" *Agostini,* 521 U.S. at 233, 117 S.Ct. 1997 (citing *Aguilar v. Felton,* 473 U.S. 402, 413-14, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985)). In *Agostini,* the Court concluded that unannounced monthly visits by public supervisors to entities receiving government assistance were not constitutionally objectionable. *Id.* at 234, 117 S.Ct. 1997 ("[W]e have not found excessive entanglement in cases in which States imposed far more onerous burdens

on religious institutions than the monitoring system at issue here.") (citing *Bowen v. Kendrick,* 487 U.S. 589, 615-17, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (finding no excessive entanglement where state reviewed use of materials and programs conceived by religious grantees of federal aid and monitored recipients' activities through periodic visits)).

 When the constitutionality of state funding is measured by how taxpayer money is used by a recipient, the state must monitor the activities that are supported by that funding. Such monitoring does not necessarily amount to excessive entanglement, especially given the parameters established in *Agostini.* In this case, plaintiffs have presented no evidence that the Faith Works program would require more state supervision than the type of periodic monitoring deemed constitutional in *Agostini.* Thus, the evidence provides no reason to conclude that the state has become excessively entangled in religion by funding Faith Works or that it risks becoming so entangled.

### 2. *Governmental indoctrination*

Because plaintiffs have failed to show that Faith Works has no secular purpose or that it defines recipients by religion or that the state's funding of the program creates excessive entanglement, I turn to the question whether the challenged action "result[s] in governmental indoctrination." *Agostini,* 521 U.S. at 223, 117 S.Ct. 1997. To meet this criterion, plaintiffs must establish that the public funding of Faith Works constitutes indoctrination or results in it and that such indoctrination is attributable to the government. *Id.* at 226, 117 S.Ct. 1997 (question of governmental indoctrination hinges on whether funding is result of private decision of individuals and could be attributed to state decision mak-

ing) (citing *Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 10, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993)).

Despite the unsettled nature of establishment clause law, it is clear that not every governmental action that results in indoctrination constitutes "governmental indoctrination." *See, e.g.,Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (upholding state reimbursement of religious student group for costs incurred in printing indoctrinating publication); *Zobrest*, 509 U.S. at 3, 113 S.Ct. 2462 (allowing state to provide interpreter for deaf student at parochial school); *Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (upholding state funding of visually impaired student's rehabilitative assistance at religious school). However, direct state funding of persons who actively inculcate religious beliefs crosses the line between permissible and impermissible government action under the First Amendment. *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 416 (2d Cir.2001).

a. Presence of indoctrination

It is well settled that the establishment clause prohibits "government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith." *Bowen*, 487 U.S. at 611, 108 S.Ct. 2562. Although it is "inappropriate to presume inculcation of religion," *Mitchell*, 530 U.S. at 858, 120 S.Ct. 2530, it is not necessary to make any presumptions to conclude that the Faith Works program inculcates religion. As its name suggests, Faith Works is a faith-based treatment program whose bylaws state that it employs a Christian-enhanced model of the Alcoholics Anonymous 12–step program. Participants are told at an intake interview

that the program is faith-based. They are not required to discuss issues of spirituality at the AA meetings or at any other time, but that attendance at the enhanced AA meetings is mandatory. Although AA is not a traditional form of religious worship, the First Amendment applies to "any religious activit[y] or institution[ ], whatever [it] may be called, or whatever form [it] may adopt to teach or practice religion." *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The Court of Appeals for the Seventh Circuit has held that the content of traditional AA meetings is religious as a matter of law even when the meetings did not employ a "Christian-enhanced" model such as the one Faith Works uses. *Kerr v. Farrey*, 95 F.3d 472, 480 (7th Cir.1996) ("A straightforward reading of the twelve steps shows clearly that the steps are based on the monotheistic idea of a single God or Supreme Being ... [or, in other words,] on a religious concept of a Higher Power."). *See also Bausch v. Sumiec*, 139 F.Supp.2d 1029, 1033 (E.D.Wis.2001) (defendant program based on principles of AA and NA and having substantial religious component concedes it is religious in nature).

In addition to its AA programming, Faith Works sponsors other religious activities, such as Bible study, chapel services and prayer time each day. Faith Works counselors are available to "facilitate a transformation of the mind and soul" and they are prepared to study the Bible, pray with participants and provide guidance on getting connected with a local faith community. Counselors are not required to be of a particular faith, but their Christian-based spirituality is considered a factor in the hiring process. The Faith Works Standards of Practice, a guideline for all staff, states that "We are as individuals to be growing in our own faith life by regular church attendance, prayer, Bible

study and seeking Spiritual direction from a Pastor/Shepherd in our faith community." Although faith is only one aspect of the participants' lives that counselors strive to improve, Faith Works staff encourage participants to integrate spirituality into their recovery program. In the employee handbook distributed to all employees, Faith Works includes a statement of faith that describes in detail the Christian beliefs that provide the framework for the Faith Works program: "The essence of this ministry is to develop a community of believers that would foster rigorous honesty; first with God, second with oneself and third with the Body of Christ."

Defendants assert that the statement of faith does not reflect the Milwaukee Faith Works program because the statement was prepared for a different program, under which conversion to Christianity was a goal. They argue that Faith Works is based on a different model that focuses on the secular goals of drug therapy, education, employment and housing and that these secular goals are motivated by the Christian values expressed in the statement of faith, but that in practice Faith Works is not pervasively sectarian. Defendants encourage this court to look beyond "institutional rhetoric," *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), to determine whether Faith Works is pervasively sectarian. *Tilton v. Richardson*, 403 U.S. 672, 681, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (examining actual practices of institution in determining whether it is "characterized by an atmosphere of ... freedom rather than religious indoctrination"). In short, defendants argue that this court should not conclude that Faith Works indoctrinates religion simply because the services it provides are consistent with the director's or employees' religious values.

Defendants' argument is unpersuasive. The fact that the statement of faith was prepared for a different program does not change the fact that staff at Faith Works in Milwaukee included the statement of faith in the employee handbook distributed to every Faith Works employee. Regardless of the original target audience, the statement appears at the beginning of the Faith Works handbook as the vision of Faith Works to be read by employees who have intimate, daily contact with participants.

Although Faith Works may have the secular purposes of providing drug treatment, education and job training, this does not mean that religion does not permeate the programming. A "pervasively sectarian" institution is one in which the organization's "secular activities cannot be separated from sectarian ones." *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 755, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

Defendants contend that the religious components of Faith Works can be separated from its secular ones. They point to the Department of Workforce Development grant, which funds secular services such as room, board, job readiness training, employment placement services, housing assistance and family reunification, but ostensibly not religious indoctrination. Defendants neglect to point out that they used the integration of religion into Faith Works' recovery model as a strong selling point for obtaining funding. The governor chose to fund Faith Works from his discretionary funds because of its unique holistic recovery model and the extended length of the program. Faith Works won the Department of Corrections grant in part because of its unique long-term, faith-based approach to drug treatment. Faith Works cannot now try to excise religion from its offerings, saying that it contracted with

the state to provide the wholly secular services of room and board without any reference to religion. This assertion rings hollow in light of the literature Faith Works provided the state. Taking into consideration Faith Works' daily activities as well as its faith-based approach to drug treatment, I conclude that the Faith Works program indoctrinates its participants in religion, primarily through its counselors.

b. Attribution of indoctrination to the state

Simply because a state-funded program engages in indoctrination does not mean that the program's funding is unconstitutional. The establishment clause targets only indoctrination that "could reasonably be attributed to governmental action." *Mitchell,* 530 U.S. at 809, 120 S.Ct. 2530 (Thomas, J., plurality). To determine whether the religious activities of Faith Works constitute governmental indoctrination, it must be determined whether the activities are supported by unrestricted, direct state funding.

"[S]tates may not make unrestricted cash payments directly to religious institutions." *Bugher,* 249 F.3d at 612 (citing *Tilton,* 403 U.S. at 680–83, 91 S.Ct. 2091). Direct subsidies are viewed as governmental advancement or indoctrination of religion. *Rosenberger,* 515 U.S. at 842, 115 S.Ct. 2510 ("special Establishment Clause dangers [exist] where the government makes direct money payments to sectarian institutions"). In contrast, when public funding flows to faith-based organizations solely as a result of the "genuinely independent and private choices of individuals," the funding is considered indirect. *Agostini,* 521 U.S. at 226, 117 S.Ct. 1997. When a program receives indirect funding, it is the individual participant, and not the state, who chooses to support the religious

organization, reducing the likelihood that the public funding has the primary effect of advancing religion in violation of the establishment clause. A plurality of the Supreme Court has held that as long as the individual selects the publicly funded program freely, thus making the funding truly indirect, it is irrelevant whether the funding passes through the hands of the individual first or goes directly to the selected program. *Mitchell,* 530 U.S. at 817, 120 S.Ct. 2530 (Thomas, J., plurality).

Plaintiffs assert that two streams of state funding to Faith Works violate the establishment clause: the funding that Faith Works receives under the Department of Workforce Development grant from the governor's discretionary fund and the funding that Faith Works receives under its contract with the Department of Corrections. Plaintiffs characterize both funding streams as direct aid to Faith Works, an organization that inculcates religious beliefs. I agree as to the Department of Workforce Development funding. However, the undisputed facts do not establish whether the Department of Corrections funding flows to Faith Works "only as a result of the genuinely independent and private choice" of supervised offenders. *Id.* at 841, 120 S.Ct. 2530 (O'Connor, J., concurring). Thus, I am unable to determine whether the Department of Corrections funding of Faith Works constitutes direct or indirect funding and, ultimately, whether it violates the establishment clause.

(1) Department of Workforce Development funding

The parties do not dispute that the funding that Faith Works receives under the Department of Workforce Development grant from the governor's discretionary fund constitutes direct funding. Under its 1998 and 1999 Department of Workforce Development grants, Faith Works receives

funding from the state in a pre-determined amount without regard to how many Wisconsin Works recipients enroll in the program. Despite the fact that Wisconsin Works recipients choose independently to enroll in the Faith Works program, the Department of Workforce Development funding stream represents direct aid to Faith Works.

(2) Department of Corrections funding

■ Faith Works is one of several drug treatment programs that has entered into a contract with the Department of Corrections to provide treatment to offenders on probation and parole. The payments that Faith Works receives from the state are based upon the number of supervised offenders enrolled in the program, but the state plays a role in the supervised offender's decision to attend Faith Works. The undisputed facts establish that the Department of Corrections funding of Faith Works has some characteristics of direct funding and some characteristics of indirect funding, but they do not allow a determination whether the funding reaches Faith Works only as a result of the genuinely independent, private choice of the offenders.

Because the state has pre-selected Faith Works as one of several treatment programs, the offender's choice is restricted. Defendants assert that it is typical for the government to pre-approve service providers. *See, e.g., Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (schools receiving public funding accredited by state); *Witters*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (same); *Zobrest*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (same). Nevertheless, the offender does not receive a brochure listing his options; instead, probation and parole agents determine which of the pre-selected programs best suits his assessed needs and "direct" the offender to Faith Works. The undis-

puted facts do not describe the circumstances surrounding the offender's choice, such as the words that the probation and parole agents use when "directing" the offender to Faith Works or whether the offender's court order specifies *long-term* alcohol and other drug addiction treatment. Offenders do not have to accept treatment at Faith Works, but Faith Works is the only treatment program in the Milwaukee area that provides a nine-month residential program; the other residential treatment programs last only three months. From the undisputed facts, it is not clear whether an offender who has been assessed as needing a nine-month treatment program and who refuses to attend Faith Works has any appropriate treatment alternatives. In addition, the detailed contract between the Department of Corrections and Faith Works indicates that the state is not a disinterested third party that is merely providing offenders with funding to spend at a treatment program of their choosing. Because plaintiffs have introduced undisputed facts establishing that Faith Works is a program that engages in religious indoctrination attributable to the state, at trial defendants will carry the burden of proving that the offender *makes a genuinely independent, private choice* to attend Faith Works and, thus, that the Department of Corrections funding of Faith Works constitutes indirect funding that does not violate the establishment clause.

The fact that the Faith Works program is distinguishable from the school voucher cases upon which defendant-intervenor relies is not dispositive of this issue. In the school voucher scenario, the student has the option of applying the government funding to any school program of her liking; the voucher is an entitlement. *See generally Witters*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846. In contrast, under

the Department of Corrections contracts, the offender may enroll only in programs that have been pre-approved by the state. The offender is not entitled to state funding to attend a rehabilitation program of his choosing. Rather, the offender is directed to one of the pre-selected programs by a parole or probation officer on the basis of his assessed needs. To apply these conditions to the school voucher cases, the state would not only have to select a group of schools to which students could apply their vouchers, but also direct students to particular schools on the basis of their assessed needs. This extension of the facts demonstrates that the funding of Faith Works is unlike the indirect public funding in the school voucher cases. However, as defendants point out, indirect forms of aid are not limited to programs of portable certificates or vouchers but instead may take the form of a tax deduction for students enrolled in parochial schools, *Mueller*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721, rehabilitative assistance for a visually impaired student, *Witters*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846, or an interpreter for a deaf student, *Zobrest*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1.

Defendants rely on school aid diversion decisions to support the proposition that the Department of Corrections funding to Faith Works results from private decision making and, therefore, is indirect funding for the purpose of establishment clause analysis. However, the school aid diversion cases involve public funding that was earmarked by the government to be used for secular purposes only, such as for educational materials and equipment, *Mitchell*, 530 U.S. at 801, 120 S.Ct. 2530, an interpreter for a deaf student, *Zobrest*, 509 U.S. at 10, 12, 113 S.Ct. 2462, and vocational rehabilitation assistance grants to blind students, *Witters*, 474 U.S. at 488, 106 S.Ct. 748. One of the objections to the provision of funds for secular purposes

was that it allowed religious schools to "divert" other funding to religious purposes. The Supreme Court was not persuaded by this objection. *See, e.g., Mitchell*, 530 U.S. at 820, 120 S.Ct. 2530 ("So long as the governmental aid is not itself 'unsuitable for use in the public schools because of religious content,' [*Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236, 245, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) ], and eligibility for aid is determined in a constitutionally permissible manner, any use of that aid to indoctrinate cannot be attributed to the government and is thus not of constitutional concern."). In this case, the Department of Corrections chose to fund Faith Works' unique, faith-based approach to drug treatment rather than a limited secular activity, such as a soup kitchen or a homeless shelter. The fact that the state chose to fund a drug treatment program built upon a faith-enhanced AA distinguishes this case from those in which the state sponsored tools that were inherently secular, but allowed their recipients to divert funds to sectarian purposes.

In summary, the undisputed facts do not establish whether, when an offender enrolls in Faith Works, it is the type of "genuinely independent and private choice[ ]" required in *Agostini*, 521 U.S. at 226, 117 S.Ct. 1997. Accordingly, I am unable to conclude whether the Department of Corrections contract constitutes direct or indirect funding of Faith Works. Therefore, I will deny both plaintiffs' and defendant-intervenor Faith Works' motions for summary judgment as to this funding source. However, I will continue to address the parties' arguments relating to the Department of Corrections funding in order to narrow the issues to be addressed at trial.

The parties raise several additional arguments concerning the constitutionality of

Faith Works' funding. Because I have already determined that the Department of Workforce Development's grant to Faith Works constitutes unrestricted, direct funding of an organization that engages in religious indoctrination and I am unable to conclude whether the Department of Corrections contract constitutes direct or indirect funding, none of the additional arguments change the disposition of the motions for summary judgment. Nonetheless, I will address the additional arguments for the sake of completeness.

c. Defendants' arguments as to why indoctrination is not state indoctrination

Defendants assert that even if the Faith Works program is religious in nature and even if both funding streams represent direct funding, the public funding of Faith Works does not constitute state indoctrination for several reasons, all of which focus on separating the religious component of Faith Works from the rest of the program and insuring that public funds are not put to religious purposes. Defendants overlook the fact that religion is so integral to the Faith Works program that it is not possible to isolate it from the program as a whole. Therefore, the following arguments do not change the determination that public funds are deposited into the coffers of Faith Works, a program that promotes religious principles and a sectarian point of view.

### (1) 20% of counselors' time

Programs in which religious indoctrination is conducted by persons paid with government funds are likely to implicate the establishment clause, *Agostini,* 521 U.S. at 227, 117 S.Ct. 1997; *Mitchell,* 530 U.S. at 858, 120 S.Ct. 2530 (O'Connor, J., concurring), as are programs in which there is significant actual diversion of government aid to the religious purposes of the organization, *Agostini,* 521 U.S. at 226–27, 117 S.Ct. 1997; *Mitchell,* 530 U.S. at 857, 860–61, 120 S.Ct. 2530 (O'Connor, J., concurring). Defendants point out that counselors spend only 20% of their time addressing questions of spirituality and argue from this that Faith Works' religious activities can be distinguished from its secular ones for funding purposes. *Hunt,* 413 U.S. at 743, 93 S.Ct. 2868. Defendants' ability to estimate how much time counselors spend on religious versus non-religious matters does not mean that it is possible to make a clear distinction between the two roles the counselors play. Defendants themselves admit that Faith Works counselors engage in religious counseling on an "as needed" basis. Although defendants characterize the religious role of Faith Works counselors as passive, one of the factors used in hiring Faith Works' counselors is that they be spiritually inclined. Moreover, counselors are available to discuss issues of spirituality at any time. Therefore, it is not possible to conclude that the counselors' duties are 80% religion-free. It follows that the religious responsibilities of the counselors cannot be estimated and distinguished from the job responsibilities that are publicly funded.

### (2) Budgetary reasons

Faith Works asserts that its revised budget shows that it receives enough private funding to pay for the salaries of the three counselors and the administrator who supervises their activities, so that the activities of the counselors cannot be attributed to grants from the state. According to defendants, only a fraction of Faith Works' expenses are related to counseling services and the normal operating costs of the drug treatment center are financed with funding that Faith Works receives from the state, including the Department of Workforce Development and the Department of Corrections. In effect, defendants argue that because Faith Works has

private funds in an amount equal to or greater than the cost of religious salaries, Faith Works' sectarian activities should be deemed not to be publicly funded.

The fact that Faith Works revised its 2001 budget to demonstrate that it expects to receive enough private funding to cover the costs of its counselors' salaries does not change the conclusion that there is no way to excise any activities offending the establishment clause from state funding. The public and private funding that Faith Works receives is deposited into the same account and is not earmarked for one purpose or another. Therefore, it is not accurate for Faith Works to assert that public funding is not used to pay counselor salaries.

The Supreme Court has systematically rejected attempts to unbundle religious activities through statistics and accounting. In *Committee for Public Education v. Nyquist*, 413 U.S. 756, 778–79, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the plaintiff school tried unsuccessfully to justify public funding of the maintenance and repair of sectarian schools by using statistics to allocate funding between secular and sectarian functions. The Court noted that it "takes little imagination to perceive the extent to which States might openly subsidize parochial schools under such a loose standard of scrutiny." *Id.* at 779, 93 S.Ct. 2955. In the cases cited by defendants, the Supreme Court has not found a violation of the establishment clause where public support was provided for specifically identified secular materials such as books, *Agostini*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391, educational materials, *Mitchell*, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660, and a sign language interpreter, *Zobrest*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1. "In those instances in which the Court has permitted funding to flow to religious schools, it has been in the context of a targeted grant, available to a limited population, for a specific purpose." *Strout v. Albanese*, 178 F.3d 57, 62 (1st Cir.1999). Not only are the public funds paid to Faith Works not targeted for a discrete purpose, but the funding takes the form of money rather than materials. In *Mitchell*, which involved targeted and explicitly secular school materials, the plurality, concurrence and dissent all noted that special dangers arise when *money* grants are given directly to religious institutions. 530 U.S. at 818–19, 120 S.Ct. 2530 (Thomas, J., plurality), 855 (O'Connor, J., concurring), 890 (Souter, J., dissenting). In the present case, the governor's discretionary funds given to Faith Works are not targeted or earmarked for discrete, identified secular activities. Although defendants assert that Faith Works receives sufficient private funds to pay for the counselors' salaries, this accounting procedure does not guarantee that public funds are not put to sectarian use.

In addition to defendants' accounting difficulties, a review of the contracts between Faith Works and the Department of Workforce Development and the Department of Corrections shows that it is not accurate to assert that public funding is not used to pay counselor salaries. In both agreements, Faith Works agreed to provide counseling services to participants. The state did not choose to fund Faith Works to provide housing services only; it chose Faith Works because of the length of its program and its unique holistic treatment model. Faith Works cannot now realign its budget, place counselors' salaries in the column entitled "private funding" and declare that public funds are not used in any religious capacity.

(3) Supplement rather than supplant

Along the same lines, defendants cite decisions of the Supreme Court upholding the constitutionality of funding directed to

religious organizations that supplement the organization's existing resources, rather than supplanting them. *See, e.g., Agostini*, 521 U.S. at 229, 117 S.Ct. 1997; *Mitchell*, 530 U.S. at 848–49, 120 S.Ct. 2530 (O'Connor, J., concurring). Defendants argue that the state's funding of Faith Works is supplemental in character. Funding that supplements a religious organization's activities is that which adds something to the agenda that did not exist before the funding. *Agostini*, 521 U.S. at 228, 117 S.Ct. 1997 (additional books *supplement* religious school's activities). Services are supplemental when they do not "relieve sectarian schools of costs they otherwise would have borne in educating their students." *Id.* (citing *Zobrest*, 509 U.S. at 12, 113 S.Ct. 2462). First, defendants argue that the Department of Workforce Development grant agreement requires this conclusion when it provides that the "grantee assures that it will not use WTW [Welfare–to–Work] funds to supplant or replace W–2 or other federal funds. WTW funds must expand upon and be coordinated with existing services." Second, defendants assert that the Department of Corrections contract payments merely supplement the private funds used to pay for the counselors' salaries.

I am unpersuaded by this argument. As discussed above, the state provided both sources of funding to support the entirety of Faith Works' unique, faith-enhanced programming, not to provide additional materials to an existing program. In addition, Faith Works could not have begun operations without funding from the governor's discretionary funds. The Department of Workforce Development funds were crucial to support the primary functions of Faith Works and they remain so. The departmental funds are not supplemental. They relieve Faith Works of costs it otherwise would have borne in providing drug treatment programming to partici-

pants. *See Agostini*, 521 U.S. at 228, 117 S.Ct. 1997. The restrictive language in the Welfare–to–Work grant agreement does not require a different conclusion.

As to the Department of Corrections funding, I have already determined that it is not possible to determine that public funding is not used to pay counselors' salaries. Instead, all funding goes into the same account from which all expenses, secular and sectarian, are paid. As a result, state funding provides for services that are integral to the program and not only ones that expand upon the existing services. Accordingly, public funding made to Faith Works does not supplement the normal programming but instead supplants it, implicating the establishment clause.

#### (4) Safeguards

Defendants argue that adequate safeguards are in place to prevent the diversion of government aid to Faith Works' religious activities and therefore, the funding of Faith Works does not violate the establishment clause. As in defendants' previous three arguments, this argument fails because it is not possible to separate the secular portions of the Faith Works program from its sectarian ones. In the case of both challenged funding streams, the state chose to fund the entirety of the Faith Works program and not simply its secular housing or employment aspects. No matter how many safeguards are in place, public funding is flowing to the Faith Works program as a whole, a program that engages in indoctrination attributable to the state.

The danger of implicating the establishment clause is elevated when there are inadequate safeguards in place to insure that direct, public funds are restricted to secular purposes. "[R]egardless of whether [organizations] are pervasively sectarian or not, states may not make *unrestricted*

cash payments directly to religious institutions." *Bugher*, 249 F.3d at 612 (citing *Tilton*, 403 U.S. at 680–83, 91 S.Ct. 2091) (emphasis added) (direct public funding to private schools without statutory limitations on use of grant money, penalty for failure to comply and no ability or effort to monitor use of grant money violated establishment clause). "In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear ... that direct aid in whatever form is invalid." *Nyquist*, 413 U.S. at 780, 93 S.Ct. 2955.

Although it is not necessary for the safeguards to take the form of a provision within a statute, the presence of a statute prohibiting the use of public funds for religious purposes weighs in favor of finding that the funding does not have the primary effect of advancing religion. *Bowen*, 487 U.S. at 614, 108 S.Ct. 2562, 101 L.Ed.2d 520. However, where there are "no real restrictions on the use of the grant money by the religious schools; the money may be used as easily for maintenance of the school chapel or for the religious instruction classrooms or for connection time to view a religious website, instead of payment for the telecommunications links." *Bugher*, 249 F.3d at 613.

Defendants assert that federal law, state statutes and the grant and contract agreements insure that the funding Faith Works receives from the Department of Corrections and the Department of Workforce Development is not diverted to religious purposes. *Mitchell*, 530 U.S. at 849, 120 S.Ct. 2530 (O'Connor, J., concurring) (statute provides that all publicly-funded equipment must be 'secular, neutral, and nonideological' and prohibits 'the making of any payment ... for religious worship or instruction,'); *see also Agostini*, 521 U.S. at 235, 117 S.Ct. 1997 (monthly visits by supervisors sufficient to "prevent or detect inculcation of religion" by publicly-funded teachers). In addition to the fact that it is not possible to separate the religious components of the Faith Works program from its secular ones, the facts establish that in this case the safeguards exist in theory only. In practice, the public funds are not restricted to non-religious uses. Therefore, any violations of the establishment clause are not negated through adequate safeguards.

(a) Department of Corrections

Plaintiffs assert that there are no statutory prohibitions or administrative enforcement to prevent the contract payments from the Department of Corrections from being used to further the religious activity of Faith Works. *Bugher*, 249 F.3d at 613; cf. *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 759, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (establishment clause allows state money grants to go directly to general secular educational programs of non-pervasively sectarian religious colleges where there is statutory prohibition against sectarian use and administrative enforcement of that prohibition). According to plaintiffs, none of the statutory or administrative procurement regulations under which the Department of Corrections procured funding for the Faith Works program include any proscription on the use of state funds in religious activities or make any provision for administrative enforcement. In addition, no one from the Department of Corrections has told Faith Works about any limitations or restrictions on the use of contract payments for religious activities. There is no evidence to suggest that Department of Corrections staff visits Faith Works to determine whether it uses the contract payments for religious purposes, despite the fact that department staff has been aware from the outset that the Faith

Works treatment program integrates a religious component that requires that participants be willing to work on their faith and spiritual development. Accordingly, I conclude that there are no adequate safeguards in place to prevent Department of Corrections funds from being used in religious activities.

### (b) Department of Workforce Development grant

As to the Department of Workforce Development grant, defendants argue that there are sufficient restrictions in place to guarantee compliance with the establishment clause. Federal law places a restriction on the use of federal funds provided to the states under the Welfare–to–Work program, prohibiting the expenditure of the funds "for sectarian worship, instruction, or proselytization." 42 U.S.C. § 604a(j). Federal regulations define activities that may be funded under the Welfare–to–Work program to include employment activities that are neither religious or anti-religious. 20 C.F.R. § 645.220. Wisconsin statutes require state agencies to comply with federal laws when distributing federal funds under the Welfare–to–Work program. Wis. Stat. § 49.114(9). The grant agreement provides that the grant money may not be used to support either religious or anti-religious activity and that the state or federal government may monitor Faith Works as necessary. According to defendants, the Faith Works program provides services under laws and provisions that prohibit using the grant money for religious purposes; therefore, it cannot be inferred that the Department of Workforce Development grants have financed religious indoctrination impermissibly.

Despite defendants' assertions, the facts show that there are insufficient safeguards in place to insure that public funding paid to Faith Works through the Department of Workforce Development does not contribute to a religious end. Although there are rules restricting the use of the grant money for religious activities, the restrictions exist only on paper. Religion is integrated into the Faith Works program through the religious counseling that occurs at AA meetings, step meetings, individual counseling sessions and group counseling sessions. The governor's discretionary funds were intended to promote employment services "fully integrated with alcohol and other drug treatment counseling, as well as job and life skills training." Defendants assert that because religion was not listed in Faith Works' grant proposal as a deliverable service, the Department of Workforce Development did not fund a religious program. Nelson, the Department of Workforce Development staff member most closely involved in funding Faith Works, states that she did not know that Faith Works incorporated faith into its delivery model, despite the fact that Vergeront provided Nelson with literature describing the Faith Works program as inherently Christian, including the use of a faith-enhanced AA protocol. Nelson never investigated the faith component of Faith Works despite the federal and state laws and grant provisions prohibiting the funds from supporting religious activities. The provisions do not set out any consequences for non-compliance. No one from the state government has told Faith Works that the grant funding should not be used to fund the religious component of its service model.

It is not a sufficient protection that the grant agreement authorizes the state or federal government to audit Faith Works. A review of Faith Works' books would reveal only that a portion of the grant funding pays counselors' salaries. An audit would not reveal whether the funds were being used for religious counseling, especially when the counseling serves the

secular goal of assisting participants achieve goals of sobriety, employment and responsible fatherhood. In addition, the facts do not indicate that the state has undertaken an audit of Faith Works or that it has monitored Faith Works' use of the grant money in any other way.

Defendants point out that in *Mitchell*, the concurrence rejected the presumption that publicly funded teachers in religious schools will inculcate religion and, therefore, rejected the argument that the government has to have a failsafe mechanism capable of detecting any instance of diversion of funds to religious purposes. *Mitchell*, 530 U.S. at 861, 120 S.Ct. 2530 (O'Connor, J., concurring). By the same token, defendants assert, they are not required to demonstrate that the safeguards are foolproof. I agree. Defendants must demonstrate only that the safeguards are not inadequate, not that they are failsafe. However, the facts of this case demonstrate that the restrictions on Faith Works' use of the Department of Workforce Development funds are not only not failsafe but completely inadequate. As in *Bugher* and *Nyquist*, Faith Works' use of the grant funds is not sufficiently restricted: the funds may be used for religious indoctrination as easily as for room and board. *Bugher*, 249 F.3d at 613.

Because plaintiffs have demonstrated that it is not possible to separate the religious components of the Faith Works program from its secular ones and that the funding from both the Department of Workforce Development and the Department of Corrections is insufficiently restricted, I conclude that both streams of funding represent governmental indoctrination of religion in violation of the establishment clause, unless defendants can prove at trial that Department of Corrections offenders choose to participate in Faith Works of their own free choice.

## C. *First Amendment: Freedom of Expression and Religion*

### 1. *Free speech clause*

Faith Works contends that if this court or the state government were to bar state funding for its program because of the program's ecumenical viewpoint, its rights under the free speech clause of the First Amendment would be violated. Faith Works argues that by requesting bids from the private sector for the administration of drug and alcohol rehabilitation services, the government has invited the expression of diverse perspectives and approaches to the delivery of drug and alcohol rehabilitation services, thereby creating a limited public forum on this topic. The argument continues that, having invited the speech of private entities, the government may not then decline to fund a particular program on the basis of content or viewpoint. Faith Works does not say whether the state's decision to privatize a portion of its drug and alcohol rehabilitation services is also a matter of governmental speech or an exercise of its fiat powers. Rather, Faith Works contends only that the state government's decision to purchase rehabilitation services from the private sector implicates the speech of private individuals by creating a type of public forum or by commissioning state resources to facilitate private speech. I am not persuaded that it does.

Traditionally, First Amendment public forum analysis has been applied to the regulation of private speech activities on government property. The extent to which the government may regulate private speech depends on whether the government property or medium constitutes a traditional public forum, a designated public forum or a nonpublic forum. *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct.

1633, 140 L.Ed.2d 875 (1998) (quoting *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439). Traditional public fora include "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Similarly, designated public fora include "public property which the State has opened for use by the public as a place for expressive activity." *Id.* For the purpose of forum doctrine analysis, in both traditional and designated public fora, the government may impose restrictions on private speech only where the "regulation is necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." *Id.* Government properties that are not by tradition or designation a forum for public communication are considered "nonpublic fora or not fora at all." *Forbes*, 523 U.S. at 677, 118 S.Ct. 1633. The standard is less stringent with respect to nonpublic fora. "[T]he State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. Faith Works also discusses a fourth type of forum: the limited public forum. Under the forum doctrine, limited public fora are treated like nonpublic fora to the extent that the government may not "discriminate against speech on the basis of viewpoint, and . . . restriction[s] must be reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 2100, 150 L.Ed.2d 151 (2001) (treating as limited public forum school district's opening of school facilities for after-hours assembly of private organizations).

The forum doctrine does not proscribe the regulation of speech where the government itself is the speaker. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). When the government subsidizes a program to provide social services, it may make viewpoint-based funding decisions or impose content-based restrictions without running afoul of the First Amendment. *See Rust v. Sullivan*, 500 U.S. 173, 192–93, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (holding that free speech clause not violated by regulations by Department of Health and Human Services, prohibiting recipients of federal subsidies under Title X of Public Health Service Act from engaging in abortion counseling or referral); *see also Velazquez*, 531 U.S. at 541, 121 S.Ct. 1043 (acknowledging that "viewpoint based funding decisions can be sustained in instances in which the government itself is the speaker, or in instances . . . in which the government use[s] private speakers to transmit information pertaining to its own program"). Under First Amendment analysis, the government's appropriation of funds to promote its own policy is distinct from the government's appropriation of funds to foster public discourse and "encourage a diversity of views from private speakers." *Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510 (distinguishing speech of state university, its professors and agents from subsidy to facilitate extracurricular speech activities of its students). The government's appropriation of funds to advance, communicate and deliver its own policy amounts to governmental speech and "it is entitled to say what it wishes." *Id.* at 833, 115 S.Ct. 2510; *see also Velazquez*, 531 U.S. at 541, 121 S.Ct. 1043 (acknowledging that health counseling activities subsidized in *Rust* amounted to governmental speech). Furthermore, when the government "appropriates public funds to establish a program[,] it is enti-

tled to define the limits of that program." *Rust*, 500 U.S. at 194, 111 S.Ct. 1759. In determining the parameters of its programs, the government may choose to encourage or subsidize particular activities appropriately without funding or encouraging alternative activities. *Id.* at 193, 111 S.Ct. 1759. By tailoring the legitimate scope and message of its programs "the Government [does] not discriminate[ ] on the basis of viewpoint[;] it [ ] merely [chooses] to fund one activity to the exclusion of the other." *Id.* To the extent that funding decisions inherently involve content-based decisions, "hold[ing] that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect." *Id.* at 194, 111 S.Ct. 1759.

■ In this case, the Wisconsin state government's appropriation of funds for the delivery of drug and alcohol treatment services through the Department of Workforce Development and the Department of Corrections does not create a forum for private speech. The state's content-based selection of private sector providers does not violate the free speech clause of the First Amendment. The state of Wisconsin's decision to contract with private entities to deliver a portion of its social services does not create, encourage or otherwise facilitate private expression. Faith Works cites recent Supreme Court decisions expanding the purview of the forum doctrine, but Wisconsin's decision to purchase drug and alcohol rehabilitation services from private sector providers is not the same thing as a school district's opening of classrooms for private assembly or a

state university's subsidization of student newspapers. Cf. *Good News Club,* 121 S.Ct. at 2100; *Rosenberger,* 515 U.S. at 834–35, 115 S.Ct. 2510; *Board of Regents of the Univ. of Wisconsin System v. Southworth,* 529 U.S. 217, 229–30, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). The state's decision to privatize a portion of its social services does not invite or implicate the protected speech of individuals any more than the state's decision to hire additional employees or purchase government vehicles. To adopt Faith Works' interpretation of the free speech clause would require the state government to recognize a forum for private expression with regard to each of its fiscal decisions. Legitimate fora for discussion of government expenditures exist in places recognized for public assembly and debate, as well as the ballot box. The First Amendment does not require the government to purchase services from every vendor that asserts it possesses a diverse point of view for fear of violating the vendor's right to free speech.

The state of Wisconsin may employ vendors to deliver drug and alcohol treatment services on the basis of content or viewpoint without violating the First Amendment. The fact that any content-based exclusion of a vendor is directed by this court pursuant to the relief requested by plaintiff does not change the First Amendment analysis. Consistent with *Rust,* a state government may make value judgments with regard to the types of activities or services that it will subsidize as well as the content of the message conveyed by private entities enlisted to deliver those services. *See Rust,* 500 U.S. at 173, 111 S.Ct. 1759 ("[T]he Government may make a value judgment ... and implement that judgment by the allocation of public funds"). A decision by the state of Wisconsin to exclude programs like Faith

Works from the social services that it purchases from the private sector is within the discretion conferred to it under governmental speech. Moreover, by defining the limits of the state-funded rehabilitation program and the content of its message, the state does not violate the First Amendment rights of private sector providers like Faith Works, which remain free to engage in speech outside the program subsidized by the government. *See id.* at 196, 111 S.Ct. 1759 (indicating that regulations did not prohibit private speech of recipient doctors; rather they required that grantees keep those activities separate from subsidized program).

## 2. *Free exercise clause*

■ Faith Works contends that the exclusion of faith-based providers burdens the rights of the program beneficiaries under the free exercise clause of the First Amendment. Faith Works asserts that the exclusion of providers with a faith-based viewpoint from the choices available to beneficiaries under the various programs is tantamount to conditioning the receipt of rehabilitation services on the waiver of free exercise rights by the program beneficiaries. Contrary to Faith Works' assertion, however, the government's selection of certain private sector providers to deliver drug and alcohol treatment services does not infringe on the free exercise rights of the recipients of those services.

■ The First Amendment's guarantee of free exercise does not require the government to subsidize an individual's exercise of that right. *See Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (rejecting "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State"). It follows that the government's decision not to subsidize the exercise of particular fundamental rights or the government's decision to subsidize one protected right without also subsidizing analogous rights does not amount to an infringement of the unsubsidized rights. *Rust,* 500 U.S. at 193–94, 111 S.Ct. 1759. To be more precise, the government's decision to subsidize particular types of rehabilitation services is distinct from the government's imposition of a penalty on alternate, unsubsidized services. *See id.* at 193, 111 S.Ct. 1759 ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."). Therefore, even though the government's subsidization of particular programs may be a factor in the decision making process of individuals eligible for subsidized treatment, the fact that an individual may desire treatment through a program that is not subsidized by the government is not tantamount to a violation of constitutional rights.

In this case, a decision to exclude programs like Faith Works from state funding would not result in an illegitimate conditioning of a government subsidy on the waiver of free exercise rights. The exclusion of particular providers from the choices available to the beneficiaries of subsidized rehabilitation services does not compel those beneficiaries to waive their exercise of religion or free speech at the risk of forgoing subsidized treatment. Individuals who qualify for subsidized drug and alcohol treatment are entitled to the services made available by the government without respect to their religious or speech activities and are not disqualified from those benefits by choosing to exercise their First Amendment rights. Moreover, if an individual wants to exercise his First Amendment right to the free exercise of

religion in a manner that is not addressed under the government's chosen rehabilitation providers, that individual is entitled to pursue such exercise outside the state-subsidized program.

### D. Constitutionality of the Charitable Choice Statute

Defendants and *amicus curiae* United States contend that this lawsuit challenges the constitutionality of the charitable choice provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 42 U.S.C. § 604a. The charitable choice provisions authorize religious and faith-based organizations to participate in federally funded social service programs on the same basis as any other non-governmental service provider. Although religious organizations have been eligible to receive government aid under certain government programs for many years, charitable choice is unique in that it does not require participating faith-based organizations to "secularize" themselves as a condition to receiving public funds. To the contrary, the charitable choice statute allows publicly funded religious organizations to retain their religious character and to employ their religious faith in carrying out secular social service programs, as long as the programs are administered in conformance with the establishment clause of the First Amendment. 42 U.S.C. § 604a(c). Specifically, the statute prohibits the use of direct governmental aid for religious worship, instruction or proselytization. 42 U.S.C. § 604a(j). Defendants and *amicus curiae* assert that a decision holding that faith-based organizations are disqualified from participation because of their pervasively sectarian nature would be inconsistent with charitable choice legislation.

Plaintiffs argue that this case does not implicate the constitutionality of the charitable choice statute. Instead, they contend that the state funding of Faith Works violates the establishment clause. According to plaintiffs, this position does not conflict with the charitable choice provisions because § 604a requires that funded programs be implemented consistently with the establishment clause and prohibits the expenditure of funds for sectarian worship, instruction or proselytization. Plaintiffs assert that the state funding of Faith Works constitutes the direct funding of religious activities, which the charitable choice statute does not permit. Because plaintiffs' challenge to the state funding of Faith Works is limited to the direct funding of religious activities not authorized by the charitable choice statute, I find that plaintiffs are not challenging the constitutionality of 42 U.S.C. § 604a and, therefore, will not address the issue.

### ORDER

IT IS DECLARED that the Department of Workforce Development's funding of Faith Works violates the establishment clause of the First Amendment to the Constitution.

FURTHER, IT IS ORDERED that

1. The motion for summary judgment filed by plaintiffs Freedom From Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker is GRANTED as to the Department of Workforce Development funding of Faith Works and DENIED as to the Department of Corrections funding of Faith Works. Defendants are directed to cease all funding of Faith Works through the Department of Workforce Development discretionary grant as it is currently implemented.

2. The motion for summary judgment filed by defendant-intervenor Faith Works Milwaukee, Inc. is DENIED.

3. A trial will be held on plaintiffs' claim that the Department of Corrections funding of Faith Works violates the establishment clause. A scheduling conference will be held at 1 p.m. on Wednesday, January 30, 2002, to set a trial date on this issue.

### ADDENDUM A

### The Faith Works Statement of Faith

*Introduction*

The essence of this ministry is to develop a community of believers that would foster rigorous honesty; first with God, second with oneself and third with the Body of Christ. We believe that if a person can approach his relationship with the Lord with brutal honesty, he can begin to be honest with himself. When a person is honest with God and oneself he can develop relationships with other believers, which is a tremendous source of God's grace and healing. It is our experience that the two most common hindrances to an effective ministry are denial and fear. "Perfect love casts out all fear." 1 John 4:18.

Once we establish this community, we can begin to fulfill God's command of love for the Brethren found in 1 John 3:16 which states, "This is how we know that the love of God has been manifested in our lives: Christ Jesus laid down His life for us. Likewise we ought to lay down our lives for each other." This will then become the vehicle of our proclamation of the 2 Gospel as Jesus stated in John 13:34–35. "They will know that you are My disciples by the love that you have for each other."

The core of our program is to invite residents into this relationship and to meet as many of their needs as God grants us the resources. Since most of the struggles these men are dealing with stem from addictions to drugs and alcohol, we combine the AA model with the Scriptures. As we all work through the "steps" together, we believe that developing relationships between the staff and clients will enable all of us to deal with addiction in a more healthy and hopeful way.

*Evangelism and the 12–Steps*

When approaching the Faith Works model in light of evangelism, we begin with the evaluation of the individual client. The "typical" man who comes to the Center is a homeless hard-core street addict, a non-church related or religious man who is disconnected from society, his family and God. To find common ground (with an understood and accepted language and point of reference), we look to the 12–Steps as a way to begin our dialog about Christ. This then provides a confessional approach to viewing one's moral responsibility, the accepting of God's forgiveness and the potential for new life.

To the addict who is looking for help and sobriety, AA is a place of safety and employs a language and conveys a message that he already accepts and appreciates. To abruptly ask this man to denounce what he is comfortable with and to learn a new set of principles and ideas that is presented to him as "different" is in my opinion the wrong place to start. Rather we look to the similarities and the overlaps of Christian Theology as seen through the Steps. We try to take the knowledge that the individual already has, and build an introduction to God through the person of Jesus Christ.

We rely heavily on the Christian experience of the staff member who has successfully, through Christ, combated addiction and homelessness and is now reconnected to society, his family and God. I also believe that if one bases this new relationship between staff and client in friendship and

in the spirit of Christ, much can be accomplished. The key is a relational approach and not on the acceptance of the individual based on a shared belief system. Once we are on the right path in fulfilling Christ's command to love our neighbor, the soil is fertile for evangelism. This holistic approach incorporates a value of the person being expressed in a supported community context.

AA has a sixty-one year track record of bringing hopeless men and women into awareness of sin and reliance on God as a way to live the abundant life. At BMTC we take what is useful from AA's methods, but aim much higher-to bring our clients directly to Christ. Although we are not an AA house, we do think some of its methods are useful in calling homeless addicts to Christ. Our approach is scripturally linked to the Apostle Paul's method of evangelism, "becoming all things to all men in order to win a few" 1 Corinthians 9:22.

*Preparing Hearts for the Gospel.*

The pathway of evangelism must be paved with an incarnate expression of the second great commandment—love your neighbor as yourself. In our context of working with men who have destructive addictions we try to discern what love "looks like" to a man in this condition. St. Francis of Assisi once said, "Preach the gospel at all times ... but seldom use words." A key passage like the good Samaritan provides important instruction to our staff members on earning the right to be heard.

Our commitment as a staff to the mandate of Matt. 25:31–40 (Parable of the sheep and goats) represents the tangible expression of love that opens hearts to the Gospel of Jesus Christ, "... for I was hungry and you gave me something to eat, thirsty and you gave me something to drink, I was a stranger and you invited me in. I needed clothes and you clothed me, I was sick and you looked after me, I was in prison and you visited me ..." We also believe in extending this passage to: "when I was uneducated you educated me, when I was confused you counseled me, when I was unemployed you trained me and helped me get a job, when I was homeless you found me a home, etc."

To us this indicates that Christ Himself understands the priority for first addressing the basic needs of the individual. The importance of first meeting a man's physical needs then turning his attention to his spiritual condition cannot be understated. Once this task is complete, we can then introduce our Christian message. We often hear from our men, "why do you love me" and our response is because He first loved us. They understand as we do that love comes from sacrifice, that Christ's love for us is sacrificial. The embodiment of this agape love is seen supremely in the Cross. Our men begin to understand His sacrifice through our giving of our lives to them. We affirm the dignity and worth of each individual regardless of their societal failure, and in so doing they begin to accept their moral responsibility to others and to God.

*Moving on towards Spiritual Maturity*

Because we believe that all that we do as men is spiritual, we invite the men to see us live out the Gospel in our everyday lives as staff members of Faith Works. It is in this broad context that we understand our role of discipling men, to shape clients personal lives and sense of moral responsibility, beginning with small baby steps. We believe that God calls us to be responsible in a loving Christian sense within all the areas of our lives. For example, we do not believe that an individual can be an exceptional employee and not be a good

father to his children; or that he cannot be an active vital member of his church and not be present in the lives of his wife and children back home. We must come to an agreement that a life that pleases the Lord is one that does not separate the natural world from the spiritual world.

Just like an expert chess player knows the proper order in which to strategize his moves, we evangelize first, building a dialogue of trust, then initiate discipleship when appropriate. After a man evidences authentic Christian conversion, our discipleship efforts include a more traditional approach. We believe in the necessity of church membership, attendance of Bible studies, gaining a spiritual mentor, as well as some more non-traditional aspects.

### Building a Bridge to the Community

The Christian community has played an integral role in bringing friendship and the love of Christ to the men at Faith Works. From our inception, we knew that if we could build a bridge from churches to Faith Works, a dynamic occurrence of ministry would be present. The idea is to start several meetings where the Christian community could be invited into the men's lives (recovery groups, Bible study, computer training, etc.). The meetings themselves are not to be the focal point, but simply a place where the outside community can build friendships and trust with our men, which is the fertile soil for Christ's work. From this platform the volunteer can now invite the client into his life of faith (church, outside Bible studies, place of employment, trips to ball games or museums, breaking bread together in their home or a simple cup of coffee). A friendship takes root where both the client and the churchman could receive the blessing of Christ and of friendship. We have seen tremendous success with some of these non-traditional approaches to discipleship.

In the past seven years I have seen the obvious ways the outside community can be of benefit to us. But the more interesting dynamic is to see faith expressing itself in love through social action that grows to become the embodiment of the Gospel. The Gospel does not manifest its power until the men of faith leave their individual experience with God and are called to love throughout the world to the least of these. See Isaiah 6:1–8.

### Reconnecting to Society

The events that take place in the life of our clients during their stay at Faith Works are not the primary focus of our recovery plan. It is relatively common, within an environment of acceptance and love, for our men to be "successful" inside the parameters of the program. The true challenge is equipping a man to re-enter society with the best possible chance for permanent success and recovery.

Our goal is to see every graduate become a member of a church, attend Bible studies, gain a spiritual advisor, and whenever possible, obtain Christian counseling services. For the men who have not yet experienced Christ's redemption, we insist that they get involved in outside AA meetings, find a "home group" and obtain a sponsor. Our hope in these cases is that their recovery will remain intact and at the very least they will still be exposed to an invitation to God, understanding that they probably will not step foot in a church.

Even for the recovering addict who is now Christian, he continues to have a need for an environment of acceptance, in the midst of his particular sin patterns and temptations. It is our experience that most church groups or even Pastors do not have the ability to hear the confession of recovering addicts without judgment or condem-

nation. They certainly can celebrate their conversion, but seldom have the wisdom or insight to handle their struggles. We believe that the ministry of confession is foundational to the success of any recovery program. Therefore in these cases we refer our graduates to an AA community as well as a church community.

*Understanding our New Life*

A common tension with recovering addicts that often emerges relates to the ongoing battle with addiction in contrast to their new identity as Christians. This tension arises once a man is considered "saved", then he identifies himself with Christ, and not as a hopeless addict. I do not want to diminish the positive attitudes of the new man. There is, in my opinion, a strong case to be said for all the scripture references that exhort us to dwell on the positive aspects of the faith: Colossians 3:1–17, "For your life is now hid with Christ in God"—Galatians 2:20, "Christ that lives in me"-Ephesians 4:17–34, "To put on the new self, created to be like God in true righteousness and holiness."

There must be a healthy tension that is respected between addiction and the new life that God calls us to, especially for the newcomers. The addict deals with strong temptations to cope with the problems of life through his addiction. Again, we believe in the ministry of confession and creating an environment where one will not feel judged or condemned. We want to build an open dialogue in order to communicate God's love and concern while hearing their confession. We cannot create and environment where a man feels that if he shares honestly the problem of wanting to drink or drug again that he will be labeled as a second class Christian. The danger of doing this cannot be overstated.

As a result of this tension there are many questions with regard to Christian liberty that we simply must continue to wrestle with. Of course none of us would suggest that because we are now "new creatures in Christ", that we can now drink alcohol responsibly or continue to be associated with people and places where we were active in our addiction. One problem that often occurs when this new Christian comes to believe that struggle is over, that the recovery process is canceled when he comes to Christ. At this point there is no respect for any practical tools in order to defend himself from the power of addiction. Time goes on and temptation comes and of course he does not have any systems in place where he can run for help. He then relapses, back on the street disconnected from God and the Church because he does not understand he vulnerability to addiction and his new life as a Christian. I believe the combative tools that God calls us to use is building a community where friendship is primary and its fruit are: honesty, confession, vulnerability, loyalty, acceptance and forgiveness. Saint Augustine said, "The knowledge of yourself produces humility, and the knowledge of God produces love."

The addict learns that he had a deep "soul sickness," and it is only by connecting to God through profession, confession, prayer and involvement in a worshipping community that he has any hope of sustaining a life in recovery. AA teaches this but stops short of recommending Christ to all. However, at Faith Works we do.