In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2850

FREEDOM FROM RELIGION FOUNDATION,
INCORPORATED, ANNE GAYLOR, ANNIE LAURIE
GAYLOR and DAN BARKER,

Plaintiffs-Appellees,

v.

MARK D. BUGHER, Secretary of
the Wisconsin Department
of Administration and member
of the TEACH Wisconsin
Board, JOHN T. BENSON,
Superintendent of Public
Instruction and member of
the TEACH Wisconsin Board,
RAYMOND ALLEN, GUS WIRTH, JR.,
L. ANNE REID, JONATHAN BARRY,
JAMES M. BOWEN, RODNEY G.
PASCH, and DARYLANN WHITEMARSH,
members of the TEACH Wisconsin
Board,

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98-C-0767-S--John C. Shabaz, Chief Judge.

Argued November 13, 2000--Decided April 27, 2001

Before HARLINGTON WOOD, JR., KANNE, and DIANE P. WOOD,
Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.  On November
4, 1998, Freedom From Religion Foundation, Inc.,
a national organization whose purpose is to
protect the fundamental constitutional principle
of separation of church and state, and individual
plaintiffs Anne Gaylor, Annie Laurie Gaylor, and
Dan Barker (collectively, the "Plaintiffs")
initiated this action. Pursuant to 42 U.S.C. sec.
1983, Plaintiffs challenged the constitutionality
of a Wisconsin program which subsidizes
telecommunications access for both public and
private, sectarian and nonsectarian, schools. On
cross motions for summary judgment, the district
court concluded that the program was

constitutional except for that portion which provided unrestricted cash grants to private, sectarian schools in order to reduce the cost of their existing telecommunications access expenses. The court granted summary judgment in part in favor of the Defendants, finding the access portion of the program was constitutional, and in part in favor of the Plaintiffs, finding that the grant aspect of the program was unconstitutional under the Establishment Clause. The Defendants appeal from the summary judgment in favor of the Plaintiffs as to the grant portion of the program. Although the Plaintiffs had initially appealed the summary judgment in favor of the Defendants that the major portion of the program was constitutional, after the publication of Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530 (2000), a case which challenged the constitutionality of state and federal school aid programs as applied to parochial schools in Louisiana, Plaintiffs dismissed their cross appeal. We have jurisdiction under 28 U.S.C. sec. 1291, and we affirm the district court's holding.


I.  Background

 The 1997-98 Wisconsin Budget Act, 1997 Wis. Act 27, created the Technology for Education Achievement Board (the "TEACH board"), which administers the Educational Telecommunications Access program, Wis. Stat. sec. 196.218 (4r) (the "program"). Defendants are members of the TEACH board. The program is funded by mandatory contributions from telecommunications providers who are permitted to increase their rates to customers in order to recover the costs. The individual plaintiffs are taxpayers of the state of Wisconsin and are local telephone service customers of Ameritech Wisconsin. The individual plaintiffs pay a monthly surcharge to Ameritech by which Ameritech recovers its contributions used to fund the program.

 Under the terms of the program, private elementary and secondary schools and colleges, technical colleges, cooperative educational service organizations, public library boards, and public school districts are able to request that the TEACH board provide them with access to one data line or video link, which enables the user to access the Internet. A video link also enables the user to create an interactive television hook-up whereby students and a teacher can see, hear, and speak to each other via television from remote locations. The data lines and video links provided by the state under the program are heavily subsidized. Although program participants are charged $100 per month for a data line and $250 per month for a video link, the cost to the

program to provide a data line and a video link is approximately $640 and $2,300 per month, respectively.

Private schools and colleges, almost all of which are religiously affiliated, are not permitted to participate in any of the broader aspects of the legislative initiatives, but are authorized only to participate in the portion of the program that allows them to contract with the state for low-cost access to a data line or video link, or to receive grants to reduce the net cost of their existing data line or video link. These private schools account for approximately ten percent of the total cost of the program. The program does not in any way control the content of information received by participants over the data lines or video links, although such links are sometimes used to transmit religious information.

The program was amended in 1997 by Wis. Act 237 to provide grants to school districts and private schools which had contracts for access to a data line or video link in effect on October 14, 1997. The grant amount is the difference between the cost to the program to supply a link less the ordinary contribution of the school, but not to exceed the actual contract cost. Wis. Stat. sec. 196.218 (4r)(g). No statutory restriction is placed on the use of the grant funds, although a letter accompanying the grant provides that the funds are to be used for "educational technology purposes . . . includ[ing] making payments on the existing service contract, purchasing hardware and software, providing training to teachers and staff, upgrading existing networks, wiring school buildings, or completing any other educational technology project."

Prior to the district court's ruling, the program had awarded annual grants of $1,944,261 to 130 schools and colleges. A portion of that total, $58,873, approximately three percent, has been awarded to nine private, religiously-affiliated schools and colleges participating in the grant portion of the program. These nine schools represent not quite seven percent of the total number of schools participating in this aspect of the program. Only these unrestricted cash grants to religious schools are at issue in this appeal.

II.  Analysis
A.  Standing

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975). Under Article III, only a

plaintiff with a personal stake in a case or controversy has standing. Gonzales v. North Township, 4 F.3d 1412, 1415 (7th Cir. 1993). This personal stake can be established only if the plaintiff has suffered an injury in fact. Warth, 422 U.S. at 499. At the summary judgment stage, the plaintiff must produce evidence in the form of Fed.R.Civ.P. 56(e) affidavits or documents that support the injury allegation. See United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 (1973); Gonzales, 4 F.3d at 1415. Plaintiffs have met the standing requirement by showing that as taxpayers their tax dollars have gone to support an allegedly unconstitutional program which contributes unrestricted cash grants to religious schools. See Flast v. Cohen, 392 U.S. 83, 105-06 (1968); Gonzales, 4 F.3d at 1416; Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1470 (7th Cir. 1988).

B.  Cash Grants

 We review de novo the decision of the district court to grant summary judgment. See Gonzales, 4 F.3d at 1417 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986)). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we must review the record in the light most favorable to the Defendants in this case and make all reasonable inferences in their favor. See Anderson, 477 U.S. at 255 (citation omitted). Because the parties do not dispute the material facts, we review de novo the district court's conclusions of law. See Freedom from Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 490 (7th Cir. 2000) (citation omitted).

 The Establishment Clause, which states that "Congress shall make no law respecting the establishment of religion," U.S. const. amend. I., cl. 1, prevents the government from promoting or affiliating with any religious doctrine or organization. See County of Allegeheny v. American Civil Liberties Union, 492 U.S. 573, 590 (1989); Gonzales, 4 F.3d at 1417. The Establishment Clause also "is a specific prohibition on forms of state intervention in religious affairs . . . ." Lee v. Weisman, 505 U.S. 577, 590 (1992). This applies equally to state legislatures under the due process clause of the Fourteenth Amendment. See Cantwell v.

Connecticut, 310 U.S. 296, 303 (1940). In addition, the Wisconsin Constitution, art. I, sec. 18, provides, "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries," which has been held to be the equivalent of the Establishment Clause by the Wisconsin Supreme Court. See Jackson v. Benson, 578 N.W.2d 602, 620 (Wis. 1998) (citation omitted).

In an effort to prevent sponsorship, financial support, or active involvement of the government in religious activity, see Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970), the Supreme Court formulated a three-pronged test to determine whether a statute complies with the Establishment Clause. See Lemon v. Kurtzman, 403 U.S. 602, 612 (1971). Under this test, a statute does not violate the Establishment Clause if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create excessive entanglement between government and religion. Id. at 612-13. In Agostini v. Felton, 521 U.S. 203 (1997), the Supreme Court modified the Lemon test in cases involving school aid, emphasizing the continuing importance of the first two prongs of Lemon, but determining that entanglement could be considered as an aspect of the second prong's "effect" inquiry. Id. at 222-23. The Court then used "three primary criteria" in evaluating whether government aid has the effect of advancing religion: whether the statute or program in question "result[s] in governmental indoctrination; define[s] it recipients by reference to religion; or create[s] an excessive entanglement." Id. at 234.

Plaintiffs concede that the TEACH program has a secular purpose, that of encouraging schools to use and teach telecommunications, and that the program does not foster excessive governmental entanglement with religion. Therefore, the first and third prongs of the Lemon test are not at issue in this case. Our inquiry is a narrow one where only the "effect" of the governmental aid need be considered. See Mitchell, 120 S.Ct. at 2540. We must determine under the second prong of Lemon whether or not the principal or primary effect of direct cash grants advances or inhibits religion. Under Agostini's "three primary criteria" review of this prong, the statute clearly does not define its recipients by reference to religion and Plaintiffs concede there is no excessive entanglement. See Agostini, 521 U.S. at 234. Therefore, only the first criteria need be examined under the effect inquiry--whether the direct cash grant portion of the program results in governmental

indoctrination. See Mitchell, 120 S.Ct. at 2540. "[T]he question whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action." Id. at 2541.

The Supreme Court has stated that direct aid is considered to have a "principal or primary effect" of advancing religion if the aid goes to institutions that are "pervasively sectarian." See Bowen v. Kendrick, 487 U.S. 589, 610 (1988); Hunt v. McNair, 413 U.S. 734, 743 (1973). The Court described a "pervasively sectarian" school as "'an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission . . . .'" Bowen, 487 U.S. at 610 (quoting Hunt, 413 U.S. at 743). However, the Court itself has cautioned against using this analytical shortcut.

The Establishment Clause like the Due Process Clause is not a precise, detailed provision in a legal code capable of ready application. . . . The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all circumstances of a particular relationship."

Lynch v. Donnelly, 465 U.S. 668, 678-79 (1984) (quoting Lemon, 403 U.S. at 614). The Court noted that "an institution is not pervasively sectarian merely because it is religiously affiliated." See Hunt, 413 U.S. at 743. Further blurring the lines of this direct test, the Court in Agostini held that government aid to a pervasively sectarian institution does not impermissibly advance religion if it is the result of private choices of the individual rather than state decisionmaking, where the aid supplements rather than supplants the school's core educational funding. 521 U.S. at 226. The Court in Mitchell, which relies on Agostini to fashion its review for indoctrination, stated that "nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it. This doctrine, born of bigotry, should be buried now." Mitchell, 120 S.Ct. at 2552 (Thomas, J., plurality opinion). Given this ambiguity as to the necessity of determining whether the schools were pervasively sectarian or not, this line of cases indicates that regardless of whether schools are pervasively sectarian or not, states may not make unrestricted cash payments directly to religious

institutions. See Tilton v. Richardson, 403 U.S. 672, 680-83 (1971). "[T]he State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State." Witters v. Wash. Dept. of Servs. for Blind, 474 U.S. 481, 487 (1986) (quoting Grand Rapids School Dist. v. Ball, 473 U.S. 373, 394 (1985)). This direct subsidy is viewed as governmental advancement or indoctrination of religion. The Supreme Court has recognized that "special Establishment Clause dangers [exist] where the government makes direct money payments to sectarian institutions . . . ." Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 842 (1995) (listing cases); see also Mitchell, 120 S.Ct. at 2546.

 Of the cases which follow Lemon, the one most directly on point with the present case is Committee for Public Education v. Nyquist, 413 U.S. 756 (1973). In Nyquist, a New York statute provided in part direct money grants from the state to qualifying nonpublic, nonprofit schools, most of which were church-affiliated, id. at 768, to be used for maintenance and repair of school facilities and equipment to ensure the health, welfare, and safety of enrolled pupils. Id. at 762. Each qualifying school was required to submit an audited statement of its expenditures for maintenance and repair during the preceding year, and the grant could not exceed the total of the expenses. Id. at 764. The Court reviewed the grant program to determine whether there had been "sponsorship, financial support, [or] active involvement of the sovereign in religious activity." Id. at 772 (citing Walz, 397 U.S. at 668, and Lemon, 403 U.S. at 612). Although the Court found that the grant program passed the first prong of the Lemon test, that of secular purpose, it held that direct monetary payments to the schools, particularly where no restrictions are made requiring the money to be used for secular purposes only, failed the second prong of the test. Id. at 773, 776-77, 779-80.

Nothing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities. Absent appropriate restrictions on expenditures for these and similar purposes, it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools.

Id. at 774.

The Court repeated the warning that "a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity," in Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 747 (1976). In Roemer, the Court held that the Establishment Clause permits direct state-money grants to general secular educational programs of non-pervasively sectarian religious colleges where there is a statutory prohibition against sectarian use and an administrative enforcement of that prohibition. 426 U.S. at 759. Therefore, even if the sectarian schools in the present case were found not to be pervasively sectarian, the direct aid portion of the program still fails because there are no statutory prohibitions or administrative enforcements in place. See Roemer, 426 U.S. at 759; Nyquist, 413 U.S. at 776-77. The possible effect of religious indoctrination is not altered by the letter from the TEACH board which accompanies the grant and purports to restrict the use of the grant money. There is no authority in the statute for such a limitation, nor is there any penalty for failure to comply. See Wis. Stat. sec. 196.218(4r)(g). In addition, there is no evidence of any ability or attempt to monitor the use of the grant money received by the religious schools. Unlike Roemer, in both Nyquist and this case, there are no real restrictions on the use of the grant money by the religious schools; the money may be used as easily for maintenance of the school chapel or for the religious instruction classrooms or for connection time to view a religious website, instead of payment for the telecommunications links. See Nyquist, 413 U.S. at 774; Simmons-Harris v. Zelman, 234 F.3d 945, 959 (6th Cir. 2000).

Defendants argue that recent Supreme Court cases, by implication, have overruled Nyquist and other precedential cases on this issue. We note that Agostini does not hold that government funding that directly flows to "the coffers of religious schools" would survive an Establishment Clause challenge. 521 U.S. at 228-29. Also, as the Court pointed out in Rosenberger, "We do not confront a case where, even under a neutral program that includes nonsectarian recipients, the government is making direct money payments to an institution or group that is engaged in religious activity." 515 U.S. at 842. Defendants state that "the district court's opinion [which struck down the entire grant aspect of the program] cannot stand in light of the plurality and concurring opinions in Mitchell." The Court in Mitchell specifically stated that there may be "special Establishment Clause dangers . . . when money is given to religious schools or entities

directly rather than . . . indirectly. . . . But direct payments of money are not at issue in this case . . . ." 120 S.Ct. at 2546 (quotations and citations omitted) (emphasis in original). Mitchell is clearly distinguished from the issue at hand in that the federal government distributed funds to state and local governmental agencies, which in turn lent educational materials and equipment to public and private schools. 120 S.Ct. at 2536. Only Wolman v. Walter, 433 U.S. 229, 248-51 (1977), and Meek v. Pittenger, 421 U.S. 349, 362-66 (1975) (both cases holding in pertinent part that the lending of instructional materials and equipment to religious schools was unconstitutional), were specifically overruled by Mitchell. Id. at 2555.

In addition, the Supreme Court has refuted the possibility of overruling precedent by implication.

[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the line of cases which directly controls, leaving to this Court the prerogative of overruling its own decisions.

Agostini, 521 U.S. at 237 (quotations and citation omitted). "In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid." Nyquist, 413 U.S. at 780; see also Strout v. Albanese, 178 F.3d 57, 64 (1st Cir. 1999) ("approving direct payments of tuition by the state to sectarian schools represents a quantum leap that we are unwilling to take." (emphasis in original)). Therefore, until the Supreme Court has clearly overruled Nyquist, we must apply its holding, which "directly controls" this case. See Agostini, 521 U.S. at 237. The Wisconsin direct grant program impermissibly provides a direct subsidy to participating religious schools.

III.  Conclusion

For the above-stated reasons, we AFFIRM the district court's order granting summary judgment in part to the Plaintiffs.