Craig T. CONLEY, Plaintiff,

v.

JACKSON TOWNSHIP TRUSTEES,
et al.  Defendants.

No. 5:04 CV 0534.

United States District Court,
N.D. Ohio,
Eastern Division.

April 14, 2005.

Craig T. Conley, Canton, OH, Pro se.

Gregory A. Beck, James F. Mathews, Baker, Dublikar, Beck, Wiley & Mathews, North Canton, OH, for Defendants.

## MEMORANDUM OPINION & ORDER

VECCHAIRELLI, United States Magistrate Judge.

Pending before this Court are the cross-motions for summary judgment of Plaintiff, Craig Conley (Doc. No. 32)[1] and Defendants, Jackson Township Trustees, Jackson Township Clerk, and Jackson Township Community Improvement Corporation (Doc. No. 30)[2], on Plaintiff's Complaint. (Doc. No. 1.) The gravamen of Plaintiff's seven count Complaint is that Defendants' donations of money and office space and promises to make further donations to the Jackson Township Young Men's Christian Association violates the

---

[1] Plaintiff's Motion for Summary Judgment (Doc. No. 32), "in the interest of brevity" incorporates his Complaint (Doc. No. 1), his previously denied Motion for Partial Summary Judgment (Doc. No. 7), and an Appendix. (Doc. No. 10.) The Motion for Partial Summary Judgment (Doc. No. 7) further incorporates Plaintiff's previously denied Motion for Temporary Restraining Order (Doc. No. 1, Ex. A) and Reply Memorandum. (Doc. No. 6.) Plaintiff has also submitted a response in opposition to Defendants' Motion for summary Judgment: (Doc. No. 35.)

[2] Defendants have also submitted a Response in Opposition to Plaintiff's Motion for Summary Judgment. (Doc. No. 34.)

Establishment Clause of the First Amendment.

## I. Background

Plaintiff, Craig Conley ("Plaintiff"), is a resident and taxpayer of Stark County, Ohio and owns real property in Jackson Township, Stark County, Ohio. Defendant, Jackson Township Trustees ("Trustees"), are the duly elected past and present board of township trustees for Jackson Township, Ohio, pursuant to Ohio Revised Code ("ORC") § 505.01. Defendant, Jackson Township Clerk ("Clerk"), is the duly elected township clerk and chief financial officer of Jackson Township, Ohio, pursuant to ORC § 507.01. Facts regarding the nature and status of Defendant, Jackson Township Community Improvement Corporation ("CIC"), have not been presented to this Court. (*See* Complaint ¶¶ 3–5; Amended Answer ¶¶ 5–6.) (The Trustees, Clerk, and CIC will be collectively referred to as the "Township" or "Defendants.")

The Young Men's Christian Association of Central Stark County ("Central Stark YMCA") is a local affiliate of the National Council of Young Men's Christian Associations of the United States of America ("National YMCA"), both non-parties to this suit. Timothy Shetzer has been the chief executive officer of the Central Stark YMCA since 1997. (Deposition of Timothy J. Shetzer ("Shetzer Dep.") at 17.) In 1998, the Central Stark YMCA created a satellite office in Jackson Township (the "Jackson YMCA" or "Jackson branch") (the Central Stark YMCA and Jackson YMCA will be collectively referred to as the "Local YMCA"). (Affidavit of Tim Shetzer ("Shetzer Aff.") ¶ 3.)

### The Relationship Between Jackson Township and the Local YMCA

At present, the Jackson YMCA conducts some programs at area churches. (Shetzer Dep. at 45–46, Ex. 8.) It also maintains a staff office at the "Jackson Township hall" at no cost. (Shetzer Dep. at 73–74.) This office staffs a program director and part-time clerical personnel. The office space was issued to the Local YMCA to enable better collaboration with the Township park and recreation director. (Shetzer Dep. at 75.)

From 1998 until 2003, the Jackson YMCA received an annual payment of $10,000 to $15,000 from the Trustees. (*Id.* at 66, 69.) The Jackson YMCA used these funds to provide programs and services in the Jackson Township area, such as the development of a board for the Jackson YMCA, and activities such as youth sports, summer childcare, and fitness classes. (Shetzer Dep. at 66; Ex. 4, Letters from Tim Shetzer to Township representatives.)

In 2001, the Central Stark YMCA developed a plan to build a facility to accommodate the Jackson branch (the "Jackson YMCA facility"). (Shetzer Aff. ¶ 4.) Several community entities have provided financial and other support for this project. (*Id.*) The Jackson YMCA facility is scheduled to be built on seven acres of land in the immediate vicinity of the Jackson Township high school. (Shetzer Aff. ¶ 4.)

On June 23, 2002, the Trustees unanimously passed a budget module authorizing the allocation of $1,000,000 toward the construction of the Jackson YMCA facility (the "module"). (Shetzer Dep. at 57; Affidavit of Randy Gonzalez ("Gonzalez Aff.") ¶ 1.) None of the aid provided by Jackson Township to the Jackson YMCA will fund a specifically religious activity. (Gonzalez Aff. ¶ 5.)

Before any funds can be disbursed to the Local YMCA, several steps must still be taken by the Township. First, the Trustees must adopt a resolution funding the Jackson YMCA facility. (*Id.* ¶ 6.) A resolution describing compliance with ORC § 505.707 must also be adopted. After adoption of the appropriate resolution(s), a

purchase order must be prepared and signed by the Clerk "certifying that the funds have been lawfully authorized and appropriated and are available for disbursement." (*Id.*) The Trustees would also sign the purchase order and prepare a check. Only after these steps are completed would a check be delivered to the Local YMCA. (*Id.*)

### The Nature and Character of the Local YMCA

Although local affiliates of the National YMCA, such as the Central Stark YMCA, are autonomous organizations, each is required to (1) pay dues to the National YMCA and (2) annually certify acceptance of the National YMCA's constitution, statement of purpose, and policy and practice prohibiting discrimination based on race, sex, color, religion, or national origin. (Shetzer Dep. at 5–8, 41, Ex. 1.) The National YMCA's statement of purpose is as follows: "The [YMCA] we regard as being in its essential genius a worldwide fellowship united by a common loyalty to Jesus Christ for the purpose of developing Christian personality and building a Christian society." (Shetzer Dep., Ex. 2 at 5.) The Central Stark YMCA has a similar purpose:

Section 1. The YMCA is a worldwide fellowship of persons united by a common loyalty to the principles of Jesus Christ for the purpose of developing Christian personality and building a Christian society. The YMCA shall be nondenominational and shall not discriminate on the basis of race, sex, color, religion, or national origin.

Section 2. The purpose of this corporation shall be to provide means for the spiritual, mental, social, and physical growth of its members and constituents by conducting activities which are consistent with the spirit and teachings of Jesus Christ; and in cooperation with the homes, churches, schools, and other institutions and organizations, render such service in the community as will tend to secure better spiritual, social, economic, and moral conditions for society, and doing any and all things necessary for and incident thereto. . . .

(Shetzer Dep., Ex. 3.) An Internal Revenue Service ("IRS") Exemption Application dated November 23, 1955 states that the specific purpose of the Central Stark YMCA is to serve "youth and adults through programs, services, and activities for spiritual, mental, physical, and social growth." (Shetzer Dep., Ex. 5.) The Central Stark YMCA's four main principles are respect, responsibility, caring, and honesty. (Shetzer Dep. at 22.)

Membership in the Local YMCA is open to persons of any or no religious affiliation; and applicants are not required to disclose their religious preference. (Shetzer Aff. ¶ 5.) Local YMCA membership cards contain a "Y" symbol that has Christian significance. (Shetzer Dep. at 48.) The back of the card contains a mission statement: "To put Christian principles into practice through programs that build healthy spirit, mind, and body for all." (*Id.* at 48.) The Lake YMCA, a branch of the Central Stark YMCA, provides membership cards without the mission statement, if so requested by the member. (*Id.* at 49.) Central Stark YMCA literature and letterhead routinely bear the mission statement and Y symbol. (*Id.* at 51.)

The Central Stark YMCA conducts many programs and events through the Jackson branch, including youth sports, summer childcare, fitness classes, teen leader's clubs, and various family events. (Shetzer Dep., Ex. 4, October 24, 2003 Letter.) The 1955 IRS Exemption Application lists the Central Stark YMCA's activities as group work programs, room service, food service, educational classes, recreational programs, and *religious pro-*

*grams.* (*Id.*) However, according to the May 2004 affidavit testimony and June 2004 deposition of Mr. Shetzer, the Local YMCA is not engaged in teaching Christian beliefs "to any significant degree" and does not conduct religious services, classes, or activities. (Shetzer Dep. at 36, 39, 44; Shetzer Aff. ¶ 5.) The Central Stark YMCA's 2001 tax return included an explanation of its activities and purposes:

> The goal of all [Central Stark] YMCA programs and practices is to help participants understand that well-being means a healthy body, mind and spirit through fitness classes, youth sports, child care, senior programs and other activities. Participants build self-esteem, develop leadership skills, grow as responsible members of society and develop moral and ethical behavior.

(Doc. No. 10, IRS Form 990.)

The Green YMCA is an affiliate of the National YMCA and located in the City of Green, Summit County, Ohio; it is autonomous from the Central Stark YMCA. (Shetzer Dep. at 36; Affidavit of Craig Conley ("Conley Aff.") ¶ 6.) Plaintiff personally visited the Green YMCA facility on March 20, 2004. (*Id.*) A "Christian Mission Statement," "Christian Insignia," Biblical quotes, and other Christian symbolism appeared throughout the Green YMCA's facility. (*Id.* ¶¶ 10–16.) Flyers promoting a Good Friday prayer breakfast to be held at the Green YMCA facility on April 9, 2004 were displayed throughout the facility. (*Id.* ¶¶ 17–19.) A Good Friday prayer service was also scheduled for the same date at the Canal Square and Riverfront YMCA facilities. (*Id.* ¶ 17.)

According to Mr. Shetzer, Christian evangelism does not occur at any YMCA facility; in any event, a decision to evangelize would be within the local affiliate's discretion. (Shetzer Dep. at 41–42, 45.) Nothing in the Central Stark YMCA constitution or the National YMCA constitu-

tion prohibits a local affiliate from conducting religious services or activities. (*Id.* at 43–45.)

## II. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may rely on depositions, answers to interrogatories, and the like, to demonstrate that the non-moving party has no evidence to prove his case and hence that there can be no factual dispute. *See id.* at 328, 106 S.Ct. 2548 (White, J., concurring). But "it is not enough to move for summary judgment ... with a conclusory assertion that the [non-moving party] has no evidence to prove his case." *Id.*

Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *See Cox v. Kentucky Department of Transportation,* 53 F.3d 146, 149 (6th Cir. 1995). The trial court has no "duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). That is, the nonmoving party has an affirmative duty to direct the court's attention to spe-

cific evidence upon which it seeks to rely. *Al–Qudhai'een v. America West Airlines, Inc.,* 267 F.Supp.2d 841, 845 (S.D.Ohio 2003) (citing *In re Morris,* 260 F.3d 654, 665 (6th Cir.2001)). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment. *Reeves v. Fox Television Network,* 983 F.Supp. 703, 709 (N.D.Ohio 1997).

In assessing the merits of the motion, the court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 245 (6th Cir.), *cert. denied,* 522 U.S. 967, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997). However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251, 106 S.Ct. 2505.

## III. Analysis

The issue before this Court is under what circumstances does a governmental entity's financial support of an admittedly Christian organization violate the Establishment Clause.[3] Plaintiff challenges three separate forms of government aid: (1) the Township's annual grants, from 1998 to 2003, to the Local YMCA; (2) the Township's donation of office space to the Local YMCA; and (3) the Township's allocation of $1,000,000 toward the construction of the Jackson YMCA facility in 2001.

(Doc. No. 32, Plaintiff's Motion for Summary Judgment ("Pl.Mot.") at 2.)

## A. Relevant Legal Framework

The Establishment Clause of the First Amendment precludes governmental action "respecting an establishment of religion." U.S. CONST. amend. I. Century old jurisprudence has emphasized that while state and federal governments must maintain neutrality towards religion and its institutions, a "hermetic separation" of church and state is an impossibility that has never been required. *See Roemer v. Bd. of Public Works of Md.,* 426 U.S. 736, 747, 96 S.Ct. 2337, 49 L.Ed.2d 179 (plurality opinion) (1976); *see also Johnson v. Economic Dev. Corp. of the County of Oakland,* 241 F.3d 501, 509–10 (6th Cir. 2001). Indeed, the Supreme Court has repeatedly upheld governmental financial aid to religiously affiliated institutions and organizations. *See, e.g., Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899) (federal construction grant to a hospital operated by a religious order upheld); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (federal construction grants to religiously affiliated colleges and universities upheld); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (state issuance of revenue bonds to a Christian college upheld); *Roemer,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (annual financial grants to Catholic colleges by state upheld); *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (federal program that aids religiously affiliated organizations is not facially unconstitutional).

In its attempts to decipher the boundaries of government aid to religious insti-

---

**3.** Although Plaintiff's Complaint includes seven claims for relief, the only issue raised in the pending motions is whether the Township's aid to the Local YMCA violates the Establishment Clause.

tutions, the Court, relying on the cumulative precedent developed over many years, announced a threepronged test that has since been the foundation of analysis in any Establishment Clause case. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). First, the government activity must have a secular purpose; second, the primary effect of the activity must neither advance nor inhibit religion; and third, the activity must not "foster an excessive government entanglement with religion" (the *"Lemon* test"). *Id.*

■ In *Agostini v. Felton*, 521 U.S. 203, 232–33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Court reformulated the *Lemon* test by consolidating the entanglement and effect inquiries. "This made sense because both inquiries rely on the same evidence." *Zelman v. Simmons–Harris*, 536 U.S. 639, 668–69, 122 S.Ct. 2460, 153 L.Ed.2d 604 (O'Connor, J. concurring opinion) (citing *Agostini*, 521 U.S. at 232–33, 117 S.Ct. 1997). The entanglement prong became one of three factors relevant to the effect prong. The effect prong required that government aid (1) not result in government indoctrination; (2) not define its recipients by reference to religion; and (3) not foster an excessive government entanglement with religion. *Agostini*, 521 U.S. at 234, 117 S.Ct. 1997; *see also Johnson*, 241 F.3d at 513.

■ In analyzing the purpose prong, courts look to the legislative purpose of the statutory aid program that authorizes the aid in question. *See Johnson*, 241 F.3d at 512. In analyzing the three factors of the effect prong, courts look to the statutory scheme of the authorizing aid program. Government indoctrination does not occur if "the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose[.]" *Id.* at 513 (quoting *Mitchell v.*

*Helms,* 530 U.S. 793, 809, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000)). Courts will examine whether the aid program has neutral criteria and whether the aid is actually disbursed according to such neutral criteria. *Id.* at 513–14.

■ The second factor of the effect prong, whether the aid program defines its recipients by religion, requires an examination of the same evidence as the first factor. *Id.* at 514. The court must determine whether the "criteria for allocating the aid create a financial incentive to undertake religious indoctrination." *Id.* (quoting *Mitchell,* 530 U.S. at 813, 120 S.Ct. 2530) (internal quotations omitted). This inquiry examines whether the aid program provides some financial incentive for the recipient to use his or her aid at or for a religious institution. *Id.* at 514–15.

■ Finally, the entanglement factor of the effect prong requires an analysis of (1) "the character and purposes of the institutions that are benefited," (2) "the nature of the aid that the State provides," and (3) "the resulting relationship between the government and religious authority." *Agostini,* 521 U.S. at 232, 117 S.Ct. 1997 (quoting *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105).

It is apparent that many, if not most, Establishment Clause challenges to government aid to religious institutions involve an intertwined analysis of both the statutory aid program and the particular grants of aid authorized by the statutory program. *See Bowen,* 487 U.S. at 601, 108 S.Ct. 2562 (in many Establishment Clause cases the Court has referred "not only to the language of the statute but also to the manner in which it had been administered in practice.") Here, the statutory authority for the aid at issue is ORC § 505.707, which allows a board of township trustees to appropriate general revenue funds "to an organization that the board determines

serves a community purpose and that is exempt from federal taxation under subsection 501(a) and described in subsection 501(c)(3) of the 'Internal Revenue Code of 1986.'" The eligible organizations include those "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes or for the prevention of cruelty to children or animals." OH B. An., 2000 H.B. 315.

Plaintiff's seven-count Complaint includes a claim that ORC § 505.707 is unconstitutional to the extent it authorizes disbursements of aid to any religious organization, including the Local YMCA. (Complaint ¶ 19.) The parties' pending motions, however, limit their discussion and argument solely to whether the specific instances of aid from the Township to the Local YMCA violate the Establishment Clause. Unlike most Establishment Clause cases, there is no discussion of the purpose or general application of ORC § 505.707, or any other statutory aid program.

Regarding the *Lemon* test, Plaintiff has offered no evidence or argument relating to the secular purpose prong; nor is there any discussion of the first two factors of the effect prong: government indoctrination or financial incentive. Rather, the Plaintiff's evidence and argument address only two *Lemon* test considerations: (1) the religious nature of the Local YMCA and (2) whether any Township aid flows to the religious side of the Local YMCA.

Indeed, these two issues are critical to whether government aid has the primary effect of advancing religion. In determining that particular grants of aid did not

have the primary effect of advancing religion, the Court in *Hunt* considered whether the aid flowed (1) "to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission" or (2) to "a specifically religious activity in an otherwise substantially secular setting." *Hunt,* 413 U.S. at 743, 93 S.Ct. 2868; *see also Bowen,* 487 U.S. at 621, 108 S.Ct. 2562 (to determine whether particular grants to particular institutions were constitutional, the district court was ordered to consider (1) whether the institutions receiving the aid were "pervasively sectarian;" and/or (2) whether the aid was used to fund "specifically religious activities."); *Roemer,* 426 U.S. at 755, 96 S.Ct. 2337 (plurality opinion) (aid shall not flow to "institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones" and "if secular activities can be separated out, they alone must be funded.")

■■■ This Court will now address those issues that are in contention: (1) whether the Local YMCA is a pervasively sectarian institution and (2) whether any of the Township's aid has funded or will fund specifically religious activities.[4] The party challenging the constitutionality of the government aid bears the burden of showing that the aid fails to meet the strictures of the Establishment Clause. *See Hunt,* 413 U.S. at 746 n. 8, 93 S.Ct. 2868; *Bowen,* 487 U.S. at 621, 108 S.Ct. 2562.

## B. The Local YMCA is a Not a Pervasively Sectarian Institution

This Court first examines the nature of the Local YMCA to determine whether it

---

4. Although there is some question as to the vitality of the "pervasively sectarian test," *Mitchell,* 530 U.S. at 826, 120 S.Ct. 2530 (plurality opinion), it is still authoritative law. *Steele v. Indus. Dev. Bd. of Metro. Gov't Nashville,* 301 F.3d 401, 408 (6th Cir.2002).

Moreover, the Supreme Court has instructed lower courts to abide by specifically relevant Supreme Court decisions until the Supreme Court itself specifically overrules them. *Agostini,* 521 U.S. at 237, 117 S.Ct. 1997.

is "pervasively sectarian." There are no genuine issues of material fact as to the nature of the Local YMCA, and a ruling as a matter of law is appropriate.

*Hunt* and *Roemer* are particularly instructive. In *Hunt*, the plaintiffs brought an action challenging a South Carolina statute insofar as it authorized a proposed financing transaction involving the issuance of revenue bonds for the benefit of a Christian college. *Hunt*, 413 U.S. at 736, 93 S.Ct. 2868. In analyzing the nature of the recipient college, the Court noted that, although the college was governed largely by the South Carolina Baptist Convention, there were no religious qualifications for employment or admission; the percent of Baptist students was roughly the same as the percentage of total Baptists in the area; and the record provided no basis to conclude that the college was aimed significantly more towards sectarian, rather than secular, education. *Id.* at 743–44, 93 S.Ct. 2868. Thus, there was no basis to conclude that the college was pervasively sectarian. *Id.* at 744, 93 S.Ct. 2868.

Even more compelling is *Roemer*. At issue in *Roemer* was a Maryland law allowing annual financial aid to institutions of higher learning, so long as none of the funds were used for sectarian purposes. *Roemer*, 426 U.S. at 740–41, 96 S.Ct. 2337 (plurality opinion).[5] The plaintiffs argued that the Establishment Clause prohibited past and future disbursement of funds to four institutions affiliated with the Roman Catholic Church. *Id.* at 744, 96 S.Ct. 2337 (plurality opinion).

A description of the colleges revealed their religious nature: the colleges employed Catholic chaplains; Catholic religious exercises were held on campus; mandatory religion or theology courses were taught; some classes began with prayer; some instructors wore clerical garb; some classrooms had religious symbols; faculty applicants at two of the colleges were required to disclose their religious preference; the colleges generally favored hiring members of a religious order; and the great majority of students at the colleges were Catholic. *Id.* at 755–58, 96 S.Ct. 2337 (plurality opinion).

Despite the religious character of the colleges, the Court upheld the district court's finding that none of them were "pervasively religious." *Id.* at 759, 96 S.Ct. 2337 (plurality opinion). Important in this regard was that the colleges had a high degree of autonomy from the Church; attendance at religious services was not mandatory; the encouragement of spiritual development was only "one secondary objective;" each college prescribed to principles of academic and intellectual freedom; the presence of prayer, religious garb, and religious symbolism was not part of a college policy; employment decisions in non-theology departments were not based on religion; preference for members of a religious order was based on budgetary concerns; and student admission decisions were made without regard to religion. *Id.* at 755–58, 96 S.Ct. 2337 (plurality opinion).

Here, there is no dispute that the Local YMCA is a religious organization. Indeed, the Local YMCA's stated purpose is to develop a Christian personality, build a Christian society, provide a means for spiritual growth by "conducting activities which are consistent with the spirit and teachings of Jesus Christ," and render service so as to secure better spiritual conditions for society. (Shetzer Dep., Ex. 3.)

---

**5.** Five Justices agreed that the aid to the religious colleges was constitutional. Justice White, with whom Justice Rehnquist joined, wrote separately to emphasize his continued belief that the "entanglement" prong of the *Lemon* test was superfluous and unnecessary. *Roemer*, 426 U.S. at 768–70, 96 S.Ct. 2337 (White, J., concurring in the judgment).

Ohio statutory law, effective and last amended in 1953, states that, in general, an Ohio YMCA is "[a] society of men conducting religious services, performing Christian work, and co-operating for a mutual benefit of the membership." ORC § 1715.23. An IRS exemption filed in 1955 stated that the Local YMCA conducted religious programs. Membership cards are inscribed with a Christian symbol and mission statement. Local YMCA literature and letterhead routinely bear the mission statement and religious symbols.

On the other hand, the Local YMCA also has secular purposes and a predominantly secular operation. The Local YMCA is virtually autonomous from the National YMCA and there is no evidence that it is affiliated with any church; in addition to its religious purpose, the Local YMCA also has the secular purpose to provide a means for "mental, social, and physical growth" and to render service in the community so as to secure better "social, economic, and moral conditions for society." (Shetzer Dep., Ex 3.) Membership in the Local YMCA is open to individuals of any or no religious affiliation; and applicants are not required to disclose their religious preference. One of the Local YMCA branches provides membership cards without the religious mission statement, if so requested by the member. The Local YMCA's programs and events include youth sports, summer childcare, fitness classes, teen leadership clubs, and family events. Participants in these activities "build self-esteem, develop leadership skills, grow as responsible members of society and develop moral and ethical behavior." (Doc. No. 10; Local YMCA's 2001 IRS Form 990.) Despite the 1955 IRS

statement otherwise, the Local YMCA does not actually conduct religious services, classes, or activities; and teaching Christian beliefs does not occur "to any significant degree." (Shetzer Aff. ¶ 5.) There is no evidence that Christian evangelism occurs at any Local YMCA facility.[6]

Based on these facts, the Local YMCA, like the institutions in *Hunt* and *Roemer*, is not a "pervasively sectarian" institution. *See also Johnson*, 241 F.3d at 516–17 (describing a religious secondary school with a similar operation and purpose as the Local YMCA that was not "pervasively sectarian.")

## C. There is No Evidence that the Township's Aid Was or Will Be Used to Fund Specifically Religious Activities.

Since the Local YMCA is not a "pervasively sectarian" institution it is possible to separate the basic religious mission of the Local YMCA from its secular functions and operations. Nevertheless, the Establishment Clause requires that none of the Township's aid has been or will be used for specifically religious activities. In other words, any aid to the Local YMCA must be used exclusively for its secular purposes and operations. *See Comm. For Public Ed. and Religious Liberty v. Nyquist*, 413 U.S. 756, 780, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

Plaintiff challenges three separate instances of aid from the Township to the Local YMCA: (1) the Township's donation of office space; (2) the Township's annual grants of $10,000 to $15,000 from 1998 to 2003; and (3) the Township's allocation of

---

**6.** Plaintiff relies heavily on the fact that many Christian symbols and statements were displayed within the Green YMCA's facility; and that the Green YMCA conducted prayer breakfasts at least annually on its premises. First, the nature of the Green YMCA, which is

autonomous from the Local YMCA, is only marginally relevant. Second, the presence of religious symbols, statements, and prayer within a facility does not necessarily render the organization pervasively religious. *See Roemer*, 426 U.S. at 755–58, 96 S.Ct. 2337.

$1,000,000 toward the construction of the Jackson YMCA facility in 2001. (Doc. No. 32, Plaintiff's Motion for Summary Judgment ("Pl.Mot.") at 2.) The Plaintiff has failed to set forth any evidence evincing that the Township's actual or proposed aid to the Local YMCA has funded or will fund any specifically religious activities.

Regarding the Local YMCA's use of Township office space at no cost, there is no evidence whatsoever that any religious activities are performed in such offices. The evidence shows only that the office space is used by Local YMCA staff to plan and coordinate programs with the Township park director.

Regarding the annual grants from 1998 to 2003, the evidence indicates that these funds were used for secular programs and activities, such as the development of a board for the Jackson YMCA, and activities such as youth sports, summer childcare, and fitness classes. (Shetzer Dep., Ex. 4, Letters from Tim Shetzer to Township representatives.) In any event, there is no evidence that any of the annual grants were used for specifically religious activities.

Regarding the Township's proposed aid of $1,000,000 toward the building of the Jackson YMCA facility, there is no evidence that said aid will fund a specifically religious activity. Although there is some ambiguity as to whether the Local YMCA conducts any religious activities at *any location* (contrast 1955 IRS statement with Tim Shetzer's deposition and affidavit testimony as recent as 2004), Plaintiff has failed to come forward with evidence that religious activities occur at *any Local YMCA facility*. (Shetzer Aff. ¶ 5.) Plaintiff has offered no evidence that the Jackson YMCA facility will, upon its construction, house any specifically religious activities.

Relying on *Freedom From Religion Foundation, Inc. v. Bugher*, 249 F.3d 606 (7th Cir.2001), Plaintiff argues that, even without evidence that the $1,000,000 will actually be used for religious activities or purposes, the Township must demonstrate that effective means exist to ensure the funds are used exclusively for secular purposes. (Doc. No. 7, Pl. Mot. for Part. Summ. Judg. at 10–11.) In *Bugher*, the plaintiffs challenged the facial constitutionality of a Wisconsin aid program that authorized unrestricted cash payments to religious schools. *Id.* at 609. Although there were no statutory restrictions on the use of the grant funds, a letter accompanying any grant provided that the funds were to be used for "educational technology purposes." *Id.* The court discounted the significance of the limitations set forth in the letter because such limitations had no statutory authority and no means of enforcement. *Id.* at 613. Relying on and quoting *Nyquist*, 413 U.S. at 780, 93 S.Ct. 2955, the Seventh Circuit held that "in the absence of an effective means of guaranteeing that the state aid...will be used exclusively for secular...purposes, it is clear from our cases that direct aid in whatever form is invalid." *Id.* at 614.

Plaintiff argues that, as in *Bugher*, there are no "effective means" to ensure that the Township's $1,000,000 grant will be used exclusively for secular purposes. Courts have found that the "effective means" requirement may be satisfied by the presence of statutory restrictions on the use of government funds for religious activities. For example, in *Roemer*, the Court found that the statutory prohibition against sectarian use of the aid and administrative enforcement of that prohibition satisfied the requirement that no aid be used for specifically religious activities. *Roemer*, 426 U.S. at 759–60, 96 S.Ct. 2337 (plurality opinion); *see also Hunt*, 413 U.S. at 744–45, 93 S.Ct. 2868. While statutory safeguards may be sufficient, they are not required. *See Freedom from Religion*

*Found., Inc. v. McCallum,* 179 F.Supp.2d 950, 976 (W.D.Wis.2002).

In the instant case, there appears to be no statutory or other legislative restrictions on the use of the Township's proposed $1,000,000 to the Local YMCA. However, the facts of this case are distinguishable from those in *Bugher* and lead to the conclusion that other "effective means" exist. First, the situation in this case is somewhat unique in that the Township has not yet completed the process that may provide the means to limit these funds to secular uses. The Trustees still must adopt an appropriate resolution; and the Clerk, who is the chief financial officer of the Township, must prepare and sign a purchase order certifying that any funds disbursed to the Local YMCA were lawfully authorized and appropriated. Thus, the Township and Local YMCA still have the opportunity to implement "effective means" to ensure that the $1,000,000 is used exclusively for secular purposes.[7] And, the Township has already indicated that the $1,000,000 "will not fund a specifically religious activity." (Gonzalez Aff. ¶ 5.)

Second, there is the clear constitutional mandate that the funds be used solely for secular purposes. In light of this Memorandum Opinion and Order, the restriction on the use of the funds will be unambiguous and clear to the Trustees, Clerk, and Local YMCA. In the absence of evidence to the contrary, this Court assumes that the Township and Local YMCA will actually comply with constitutional mandates. *See Roemer,* 426 U.S. at 760, 96 S.Ct. 2337 (plurality opinion) (conclusion that government will not fund specifically religious activity was based in part on the assumption that the government and religious institution will comply with the constitutional

mandate not to use any aid for religious purposes).

Accordingly, this Court concludes that Plaintiff has failed to show that any of the Township's past, present, or future aid to the Local YMCA was, is, or will be used for specifically religious activities. To the extent *any* aid to the Local YMCA is actually used for specifically religious activities, nothing in this Memorandum Opinion and Order should be construed to preclude a legal challenge to such aid.

### IV. Conclusion

For the foregoing reasons, this Court concludes that there are no genuine issues of material fact, and the Defendants are entitled to judgment as a matter of law. Accordingly, Plaintiff's Motion for Summary Judgment (Doc. No 32) is DENIED; and Defendants' Motion for Summary Judgment (Doc. No. 30) is GRANTED.

IT IS SO ORDERED.

---

7. "Effective means" may be in the form of a Township ordinance conditioning the use of the $1,000,000 grant on the preclusion of religious activities within the Jackson YMCA facility.